DREXEL BURNHAM LAMBERT INC., Donna & Co., Germania Bank, F.S.B., Maine Savings Bank, Fidelity Bankers Life Insurance Company, the Bank of Hartford, Inc., Pima Federal Savings and Loan Association, Foothill Capital Corporation, and River Valley Savings Bank, Plaintiffs,

v.

SAXONY HEIGHTS REALTY ASSOCIATES, Acropolis Associates, Fruchthandler Brothers Enterprises, Armax Associates, Saxony Towers Realty Corp., N.S. Realty Company, T.F.A. Associates, Sheffield Gardens Holding Corp., Acrop Gardens Holding Corp., Marsar Realty Company, Acropolis Gardens Realty Corp., Sara Leifer, Rubin Schron, Mina Glick, Martin Tepper, and Nachman Nacham, United Mutual Realty Inc., Anthony Bennet, NKK Assoc. Inc., Chinom Realty, Janet Ger, Gloria Anderson, Walter Friere, Ted Carpluk, Jr., Evelyn Lott, Nestor Alvarez, Robert Bass, Jeffrey Mont, Marie Arboleda, Goldnick Associates, Arnold Berez, Steven Berger, Mark Borosky, Arlene Burke, Jay Conway, Luisa Del Villar, Louella Derera, Jeff Gruebel,

Henry Obritsch, Earthia Jenkins, Jorge Rivera, Imer Lajqi, Amzi Nebija, Caroline Lucero, Oscar Marin, Reina Natali, Bernard Otterman, Janet Sernaque, Osvaldo Serret and Jairo Arredondo, Defendants.

No. 90 Civ. 5785 (SWK).

United States District Court, S.D. New York.

Sept. 3, 1991.

Dow, Lohnes & Albertson, New York City, for plaintiffs.

Hall, Dickler, Lawler, Kent & Friedman by Seymour Shainswit, New York City, for defendants, Saxony Heights Realty Corp. and Acropolis Gardens Realty Corp.

Herrick, Feinstein by Christopher Sullivan, New York City, for all remaining defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this action involving bank loans for the refinancing and conversion of two apartment buildings into cooperative units, defendants have moved pursuant to Rules 12(b)(6), 12(b)(1) and 9(b) of the Federal Rules of Civil Procedure (hereinafter "Fed. R.Civ.P.") for an order dismissing the claims in plaintiffs' amended complaint ("Amended Complaint"). This motion follows the Court's denial of plaintiffs' motions for temporary injunctive relief and for appointment of receiver of rents. *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates*, 90 Civ. 5785, Slip.Op. (available at 1990 WL 139027 (S.D.N.Y. Sept. 14, 1990)) ("*Drexel I*"); *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates*, 90 Civ. 5785, Slip. Op. (available at 1990 WL 165707 (S.D.N.Y. Oct. 23, 1990)) ("*Drexel II*"). Familiarity with those opinions is assumed.

## BACKGROUND [1]

Plaintiffs (the "Banks") are nine institutional lenders who made non-recourse mortgage loans to several sponsors of two cooperative apartment complexes in Queens known as Saxony Towers and Acropolis Gardens (the "Complexes"). The defendants [2] fall into four categories: the sponsors of the buildings ("Sponsors"),[3] the principals ("Principals"),[4] the cooperative corporations of each of the complexes ("Coop Corporations"),[5] and the individual purchasers of the unsold units at the September 24, 1990 public auction ("Individual Purchasers") [6].

The plaintiffs lent a total of $27 million—$11 million to the Saxony Sponsor and $16 million to the Acropolis Sponsor—for construction work, rehabilitation, and cooperative conversion of the rental units in the Complexes (the "Loans"). The Loans were documented in two mortgage loan commitments dated June 19, 1987. Mortgage Loan Commitments, attached as Exhibit A to Amended Complaint. As security for the loans, the Banks received mortgages on the buildings and a security interest in other assets associated with the buildings until the implementation of the cooperative plan.

When the Complexes were converted to cooperatives in August and September of 1988, the Sponsors sold the buildings to the Coop Corporations. The Coop Corporations issued leases and shares of stock to purchasers. According to the Amended Complaint, a portion of the proceeds from the sale of cooperative units was paid to the Banks in partial satisfaction of the outstanding loans. The shares ("Unsold Shares") and leases ("Proprietary Leases") that remained unsold (the "Unsold Units") were issued back to the Sponsors.[7]

During the conversion process, loan security agreements (the "Security Agreements" or "Agreements") were signed on August 16 and September 22, 1988 between the Banks and Sponsors. Security Agreements, attached as Exhibit B to Amended Complaint. They provide, *inter alia*, that the Banks would release their mortgages on the Complexes, and would accept as substitute collateral for the remaining $23 million loan an interest in the future proceeds from the sales of the Unsold Shares and Proprietary Leases in the Complexes and the rents of the statutory tenants in the occupied Unsold Units. According to the Amended Complaint, certain recognition agreements (the "Recognition Agreements") were signed concurrently with the Security Agreements in order to induce the

1. For purposes of this motion, the facts alleged by plaintiffs in the Amended Complaint will be accepted as true. *See Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991) (citing *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964)).

2. Hereinafter, "defendants" will refer to defendant Sponsors, Principals and Coop Corporations. The Individual Purchasers are only implicated in plaintiffs' thirteenth claim for declaratory judgment which this Court addresses at the end of the opinion.

3. Sponsors include Saxony Heights Realty Associates (the "Saxony Sponsor"), which is comprised of general partners Armax Associates, Rubin Schron, Mina Glick, Sara Leifer and Fruchthandler Brothers Enterprises, and Acropolis Associates ("Acropolis Sponsor") which is comprised of general partners T.F.A. Associates, Marsar Realty Company and N.S. Realty Company, and Nachman Nacham.

4. Principals include Fruchthandler Brothers Enterprises, Armax Associates, N.S. Realty Company, T.F.A. Associates, Martin Tepper, Marsar Realty Company, Rubin Schron, Sara Leifer, Mina Glick and Nachman Nacham.

5. Coop Corporations include Saxony Towers Realty Corp. and Acropolis Gardens Realty Corp.

6. Individual Purchasers include United Mutual Realty Inc., Anthony Bennet, NKK Assoc. Inc., Chinom Realty, Janet Ger, Gloria Anderson, Walter Friere, Ted Carpluk, Jr., Evelyn Lott, Nestor Alvarez, Robert Bass, Jeffrey Mont, Marie Arboleda, Goldnick Associates, Arnold Berez, Steven Berger, Mark Borosky, Arlene Burke, Jay Conway, Luisa Del Villar, Louella Derera, Jeff Gruebel, Henry Obritsch, Earthia Jenkins, Jorge Rivera, Imer Lajqi, Amzi Nebija, Caroline Lucero, Oscar Marin, Reina Natali, Bernard Otterman, Janet Sernaque, Osvaldo Serret and Jairo Arredondo. Plaintiffs amended their September 7, 1990 complaint on November 2, 1990 in order to add defendants Individual Purchasers.

7. The majority of the Unsold Units were occupied by rent-stabilized tenants who did not wish to go along with the cooperative plans.

Banks to enter into the Security Agreements by acknowledging the Banks' rights under the Security Agreements. Recognition Agreements, attached as Exhibit C to Amended Complaint. The loans were to be non-recourse, with certain exceptions, including personal liability for the Sponsors for willful damage to or destruction of the collateral.[8]

The Amended Complaint contends that the Banks entered into the Security and Recognition Agreements based on defendants' representations which were given to ensure the value of the Banks' collateral. Amended Complaint, ¶ 29. The Amended Complaint alleges the Security Agreements provided that Sponsors were to pay maintenance for the units that remained unsold for seven years.[9] Id. Sponsors allegedly represented that they were financially sound. Id. The Security Agreements also set a minimum sales price for the Unsold Units and set forth a "best efforts" clause obligating Sponsors to sell the units at their best price.[10] Id. According to the Amended Complaint, Sponsors agreed not to assign or transfer any of the Unsold Shares except upon notice and consent of plaintiffs' loan servicing agent, Dorman & Wilson, and the Coop Corporations agreed not to accept any termination or transfer as long as the Loans were outstanding. Id. Plaintiffs further allege that the Security Agreements provided that Sponsors, insofar as they controlled the Coop Corporations as majority shareholders, would not impair the value of the Banks' security in the Unsold Units. Id. In the case of de-

fault, the Banks contend, they were entitled to the rent from the statutory tenants until their loan was repaid. Id.

In November 1989, the Sponsors ceased paying interest on the mortgage loans. Amended Complaint, ¶ 30. The Sponsors sent the Banks a letter on March 16, 1990, representing the value of the Unsold Units at $45 million. Id. "Lulled by this valuation into a false sense of security," the Amended Complaint alleges, the Banks were fraudulently induced by the Sponsors not to take any action to enforce their security interest when the Sponsors defaulted on their interest payments. Id. In April 1990 the Sponsors approached the Banks for relief from paying further interest payments on the Loans due to the downturn in the real estate market. Id. On May 31, 1990, the Sponsors allegedly stated in amendments to the Cooperative Offering Plans that they intended to continue to pay maintenance charges and principal and interest on the Loans from such sources of funding as rent from the tenants in the Unsold Units. Twelfth and Thirteenth Amendments to the Cooperative Offering Plans, attached as Exhibit E to Amended Complaint.

On June 15, 1990, Sponsors announced at a meeting that they could not meet their maintenance obligations. Amended Complaint, ¶ 32. According to the Amended Complaint, defendants misappropriated the rental payments by not paying them to the Banks. Id. The Banks contend it was at

---

**8.** The Security Agreements state in part: "[T]he Secured Party will look solely to the Collateral for any claim...." Security Agreements, attached as Exhibit B to Amended Complaint, § 29(f). However, they state that "any Principal ... shall be personally liable for any liability, loss or damage suffered by the secured Party by reason of (i) his misapplication of Proceeds ..., Awards ..., security deposits or trust funds ..., (ii) his collection of rentals under any Leases or professional or commercial leases for periods in excess of two (2) months in advance ..., (iii) his willful destruction of or willful damage by the Debtor or any of the Principals to the Collateral, or to the electrical, plumbing, heating or air conditioning systems or elevators of the Collateral, and (iv) any modification of any existing or future Leases or professional or commercial

leases or the entering into a new Lease in violation of this Loan Security Agreement...." Id.

**9.** Defendants argue that no such reference to seven years appears in any of the loan documents.

**10.** In fact, that portion of the Agreements provides in relevant part:

Borrower shall use its best efforts to cause, and diligently pursue, the consummation of the Conversion and will use its best efforts to market and sell all of the Shares, subject to economic conditions prevailing in the real estate market at such time. Nothing contained herein shall prohibit Borrower from abandoning any Conversion.

Mortgage Loan Commitments, § 6.11(xi).

this point that the defendants' alleged fraudulent scheme became obvious. *Id.*

On July 5, 1990, the Banks received letters from the Coop Corporations, which the Banks allege were still controlled by the Sponsors' interest, advising them that the Unsold Shares and Proprietary Leases had been assigned to the Holding Corporations (to which the plaintiffs refer throughout as "dummy corporations"), and new proprietary leases and shares had been issued. Letters from Coop Corporations to Dorman & Wilson, dated June 20, 1990, attached as Exhibit D to Amended Complaint.

On August 1, 1990 the Coop Corporations notified the Banks by letter that the Holding Corporations had failed to make their July maintenance payments and threatened to terminate the Proprietary Leases and sell the Unsold Shares if the Banks themselves did not cure the default. Letters from Coop Corporations to Dorman & Wilson, attached as Exhibit F to Amended Complaint. On August 15, 1990, the Coop Corporations notified the Banks that the Holding Corporations had also failed to make their August maintenance payments and made the same threat as in their August 1 letters. Letters from Coop Corporations to Dorman & Wilson, attached as Exhibit G to Amended Complaint. On September 17, 1990, the Banks were notified by letter from the Coop Corporations that the Proprietary Leases had been cancelled and the new ones would be sold at a public auction on September 24, 1990. Letters from Coop Corporations to Dorman & Wilson, attached as Exhibit H to Amended Complaint.

The Banks then applied to the Court for injunctive relief halting the auction of the Unsold Shares. On September 24, 1990, the Court denied plaintiffs' motion, finding that there was no irreparable harm in light of the Banks' inaction in failing to pursue available contract remedies. *Drexel I,* Slip Op. at 6–7. The Coop Corporations auctioned the apartments on September 24, 1990. The Banks then moved the Court to appoint a receiver of rents to protect the stream of income generated by the rent-stabilized tenants of the previously unsold shares. The Court denied the motion because the order for equitable relief would have affected persons not party to the action and might have increased the negative cash flow position of the previously unsold units. *Drexel II,* Slip Op. at 4.

In their Amended Complaint [11] the Banks assert claims for securities fraud, RICO, fraudulent conveyance and other state law claims sounding in tort and contract. In sum the Amended Complaint alleges that defendants intended to obtain from the Banks financing through fraudulent misrepresentations, and that they never intended to fulfill their obligations to the Banks, the statutory tenants and the owners of the units. *Id.,* ¶¶ 78–79.

Sponsors deny that the Security Agreements prohibited them from transferring Unsold Units. They moreover contend that even if they were prohibited from doing so, the Banks' remedy for breaching the contract was to foreclose on the loans and looked to the collateral for damages. They accuse plaintiffs of attempting to reach past their non-recourse agreement and involving the Sponsors in the default problem, which should be strictly between the Coop Corporation and the Banks.

Defendants now move for dismissal of the Amended Complaint. Defendants contend that the Banks have failed to state a claim upon which relief may be granted for the securities fraud and RICO claims; that they have not pled securities fraud or a RICO violation with the requisite particularity; and that the Court lacks subject matter jurisdiction over the state-law claims once the federal question claims are dismissed.

## DISCUSSION

I.  The Securities Fraud Claims

■ Defendants have moved to dismiss the Banks' first claim (based on § 10(b) [12]

---

**11.** The Banks amended their Complaint once, as of right. Fed.R.Civ.P. 15(a).

**12.** In relevant part, § 10(b) provides:

234

of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78j(b)] and Securities Exchange Commission Rule 10b–5 [13] [C.F.R. § 240.-10b–5]), and the second claim (based on § 20(a) [14] of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78t(a)]) for failure to state a claim. In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be read generously and every inference drawn in favor of the plaintiff. *Pross v. Katz,* 784 F.2d 455, 457 (2d Cir. 1986); *Metzner v. D.H. Blair & Co.,* 663 F.Supp. 716, 719 (S.D.N.Y.1987). A complaint should be dismissed only if it "appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Frasier v. General Electric Co.,* 930 F.2d 1004 at 1007 (2nd Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

The Banks allege in their Amended Complaint that defendants misrepresented, or never intended to fulfill, their promise to pay maintenance charges on the Unsold Units for seven years; their promise not to terminate the proprietary leases while the loans were outstanding; their agreement to use "best efforts" to sell the Unsold Units or a minimum release price in order to guarantee the Banks a certain yield; their promise not to transfer or assign the Banks' collateral without their consent;

their promise not to diminish the value of the Banks' collateral; and their promise that the Banks would receive the rent from the tenants in the Unsold Units in the case of default. Amended Complaint, ¶ 29. According to the Banks:

> [These] representations were known by the Sponsors and the Coop Corporations to be false and incomplete when made and were made with intent to deceive Plaintiffs and to induce Plaintiffs to, among other things, release the mortgages on the Buildings, accept substitute collateral as security for the Loans, and enter into the Loan Security Agreements and Recognition Agreements.

Amended Complaint, ¶ 48.

■ To state a claim under § 10(b) and Rule 10b–5, plaintiffs must allege the following: (1) material misstatements or omissions (2) indicating an intent to deceive or defraud (scienter) (3) in connection with the sale or purchase of any security (4) upon which plaintiffs detrimentally relied. *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

■ The Banks have failed to allege facts to support their conclusory allegations that the Sponsors intentionally made materially untrue statements in order to

---

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**13.** Rule 10b–5 states:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**14.** Section 20(a) states:
(a) **Joint and several liability; good faith defense.** Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

persuade the Banks to make them a non-recourse loan. At bottom, this case is a breach of contract case, not a fraud case. *See Drexel I,* Slip Op. at 6–7. The securities fraud claims merely restate the contract claims in counts three and five of the Amended Complaint. *See Cranston Print Works Co. v. Brockmann Int'l A.G.,* 521 F.Supp. 609, 614 (S.D.N.Y.1981). It is well-settled that a simple breach of contract does not constitute fraud. *See, e.g., Hotel Constructors, Inc. v. Seagrave Corp.,* 574 F.Supp. 384, 387 (S.D.N.Y.1983) ("[t]he mere failure to keep contractual promises of future acts will not sustain an action for fraud"). Moreover, an attempt to convert a contract claim into a tort claim by the additional naked assertion that the breaching party never intended to perform is doomed to fail. *Id.* at 388 ("purely conclusory allegation that defendant never intended to perform, standing alone, could not convert a claim for breach of contract into one for fraudulent inducement to contract") (citing *Cranston Print Works,* 521 F.Supp. at 614) (other citations omitted); *see Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp. 1340, 1354 (S.D.N.Y.1988) (failure to perform under contract sounded in contract and could not be converted into a tort claim of fraud just by alleging defendant never intended to fulfill its promise).

■ In order properly to convert a contract claim into a tort claim for fraud, the allegedly defrauded party must set forth in the complaint specific facts from which a reasonable trier of fact could directly or indirectly infer that the promisor intended not to honor his obligations at the time the promise was made. *See Luce,* 802 F.2d at 55; *National Westminster Bank v. Ross,* 130 B.R. 656, 664–65 (S.D.N.Y.1991); *Songbird Jet Ltd., Inc. v. Amax Inc.,* 581 F.Supp. 912, 925 (S.D.N.Y.1984), *aff'd,* 812 F.2d 713 (2d Cir.1987).

The Amended Complaint's version of the course of dealings between these parties is a classic case of the contract dispute dressed up in the language of fraud. *See Atlantic Gypsum Co. v. Lloyds Int'l Corp.,* 753 F.Supp. 505, 509 (S.D.N.Y.1990).

The Amended Complaint reads in relevant part as follows:

¶ 47. The representations and assurances made by the Sponsors and the Coop Corporations were false and fraudulent when made.

¶ 48. The representations were known by the Sponsors and the Coop Corporations to be false and incomplete when made and were made with intent to deceive Plaintiffs and to induce Plaintiffs to, among other things, release the mortgages on the Buildings, accept substitute collateral as security for the Loans, and enter into the Loan Security agreements and Recognition Agreements.

Amended Complaint ¶¶ 47–48. Although the Amended Complaint tracks the language of a fraud claim, i.e., that defendants made intentional misrepresentations at the inception of the agreements, it is utterly devoid of specific facts that would bear out those allegations. The most fact-specific allegation in support of plaintiffs' theory of a scheme to defraud appears in connection with the overvaluation of the collateral in March of 1990. Plaintiffs allege that defendants "fraudulently induced [Plaintiffs] not to exercise their rights" to foreclose on the collateral by misrepresenting that the value of the units in the Spring of 1990 was approximately $45 million. Amended Complaint ¶ 30. In a letter from one of the Sponsor defendants, dated March 16, 1990, to the Banks' loan servicing agent, the writer gives a breakdown of the various values of the unsold apartments, including, *inter alia,* those vacant and those occupied by rent-stabilized tenants. Letter of Martin B. Tepper to Dorman & Wilson, attached as Exhibit J to Amended Complaint (hereinafter the "Tepper Letter"). The letter gives a total "unclosed value" of $45 million. Tepper Letter at 1–2. The Banks contend that this letter was written in order to induce the Banks not to take any action to enforce their security interest in the collateral. *See* Amended Complaint, ¶ 30.

Plaintiffs offer no facts that would demonstrate that this estimate was untrue at the time. The fact that the Unsold Units sold for substantially less at a distress sale

six months later, where the economic and legal positions of the parties had changed dramatically, does not, without more, properly give rise to an inference of misrepresentation, much less intentional misrepresentation.

Moreover, the Banks cannot claim to have justifiably relied on such projections. The Amended Complaint itself acknowledges that as of the dates the Loan Agreements were signed in August and September 1988, the Sponsors had already sold 331 units (¶ 25) and the Recognition Agreements expressly listed actual sales prices for 88 units. Thus plaintiffs knew the actual fair market values of several hundred units as of the dates of execution of the Agreements. Furthermore, when that letter was written the Banks already knew that Sponsors had defaulted on interest payments for at least four months. Amended Complaint ¶ 30. This available information should have signalled the Banks, which are the very paradigm of sophisticated economic actors, that the Sponsors were experiencing financial difficulties.

Because there are no facts in the Amended Complaint to support even plaintiffs' most specific allegation of intentional representation, the Court finds the Amended Complaint insufficient to state a claim for securities fraud.

By contrast, the complaint in *Hotel Constructors* presented detailed factual allegations to support the theory that defendant construction subcontractors knew they could not possibly perform as promised in light of the eleven other simultaneous contractual commitments they had made. 574 F.Supp. at 388 & n. 2 (quoting Complaint ¶¶ 23, 24, 25, 32, 33). That complaint also quoted a Proxy Statement, made at or about the same time as the contract, which acknowledged the subcontractor's $60 million backlog, and a statement made by an employee of the subcontractor at about the same time, to the effect that the company was "oversold" as a result of its numerous other jobs. *Id.* The Banks' Amended Complaint in the present case does not make any such specific factual allegations to support the claim that the defendants never intended to perform or never believed they could perform on their obligations.

When such specificity is absent, the Court will dismiss the Amended Complaint. Ordinarily such a dismissal will be with leave to replead, in order to permit plaintiffs remedy the defects identified by the Court. *See Luce*, 802 F.2d at 56–57 (citations omitted). However, in the present case the Court will not permit repleading because the Amended Complaint itself undermines any possible basis the Banks might have for their bare assertions. It concedes that the Sponsors did in fact pay principal and interest on the Loans from June 10, 1987 until November of 1989.[15] *See* Amended Complaint, ¶ 30. It also sets forth that the Sponsors made maintenance payments until July 1990, two years after the Security and Recognition Agreements were signed.[16] Amended Complaint, ¶ 34. The Banks' own Amended Complaint supplies a non-fraudulent explanation for the Sponsors to have defaulted on their Agreements: the downturn in the real estate market. Amended Complaint, ¶ 30.

Plaintiffs fail to make any specific factual allegations that defendants intentionally or recklessly misrepresented material facts upon entering into the Security and Recognition Agreements or other contractual obligations or that defendants never intended to fulfill their contractual obligations. To the contrary, they allege such facts as to assure the Court that there was no scienter at the inception of the agreements. The Banks' contract claim cannot be converted to a claim for fraud, and accordingly, repleading securities fraud under these circumstances would be futile. *See Foman v.*

---

**15.** Defendants argue, and plaintiffs do not contest, that the Sponsors paid down $15.6 million in principal and $8 million in interest on the Loans. Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Complaint, dated November 13, 1990, at 38.

**16.** Defendants contend that the total amount of maintenance paid by the Sponsors under the Agreements was $7,189,303.

*Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Wilder v. Thomas,* 659 F.Supp. 1500, 1502 (S.D.N.Y.1987), *aff'd* 854 F.2d 605 (2d Cir.1988), *cert. den.,* 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). Plaintiffs' securities fraud claim under § 10(b) and Rule 10b–5 and the second claim under § 20(a) [17] will therefore be dismissed with prejudice.[18]

## II. Motion To Dismiss RICO Claims

Defendants have also moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Banks' seventh and eighth claims for, respectively, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.,* and conspiracy to violate RICO. The underlying predicate acts of racketeering activity for the RICO claims are the securities fraud violations alleged in counts one and two (15 U.S.C. §§ 78j(b), 78t(a)), wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341) and bank fraud (18 U.S.C. § 1344) related to the alleged securities fraud. Amended Complaint, ¶ 80. According to the Amended Complaint, these violations arose during the course of the following acts:

[W]illfully destroying or damaging the collateral (as defined in the Loan Security Agreements) by fraudulently transferring the Unsold Shares and Proprietary Leases to the Dummy Corporations, cancelling the Unsold Shares and terminating the Proprietary Leases and issuing New Shares and Proprietary Leases—all

with the ultimate intent of auctioning those New Shares and Proprietary Leases at a sham public auction to the detriment of Plaintiffs; fraudulently misrepresenting the value of the collateral; fraudulently inducing Plaintiffs to refrain from exercising their rights under the Loan Security Agreement; fraudulently inducing Plaintiffs not to secure their pledge of the rents by representing that such rents would be used to pay maintenance charge [sic]; and misappropriating such rents. Moreover, Plaintiffs' collateral has been further damaged to the extent they continued to be deprived of the surplus proceeds of certain of the auctioned units and the rents of the statutory tenants of the occupied units.

Amended Complaint ¶ 79. The Court will examine these allegations to determine whether, if true, they could state a claim for RICO violations and RICO conspiracy.

Section 1962(c) of RICO makes it unlawful

for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs through a pattern of racketeering activity. . . .

18 U.S.C. § 1962(c).[19] A private party may bring a cause of action under this section if it is injured in its business or property by

---

**17.** The validity of the second claim under § 20(a) is dependent upon the validity of the § 10(b) claim.

**18.** In light of this disposition, this Court need not determine the issue raised by the parties as to whether the shares in the cooperatives constitute securities for purposes of the securities laws. Nor need it address the question of plaintiffs' reliance on defendants' alleged representations.

**19.** Section 1961 defines the terms "racketeering activity," "person," "enterprise," and "pattern of racketeering activity," as follows:

(1) "racketeering activity" means . . .

&ast; &ast; &ast; &ast; &ast; &ast;

(B) any act which is indictable under . . . section 1341 (relating to mail fraud), section

1343 (relating to wire fraud), section 1344 (relating to financial institution fraud);

&ast; &ast; &ast; &ast; &ast;

(D) any offense involving . . . fraud in the sale of securities.

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity . . .;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after . . . [October 15, 1970] and the last of which occurred within ten years . . . after the prior act of racketeering activity.

18 U.S.C. § 1961.

reason of a RICO violation. 18 U.S.C. § 1964(c). To establish a RICO claim under § 1962(c), a plaintiff must "plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" (5) that has caused injury to plaintiff's business or property. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

As discussed above, the Banks' claims for securities fraud do not state a claim upon which relief can be granted. Therefore, the Banks' securities fraud claims cannot constitute predicate acts of racketeering activity within RICO. *Boley v. Pineloch Assoc., Ltd.*, 700 F.Supp. 673, 680 (S.D.N.Y.1988) (citing *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 18–19 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) (other citation omitted)).

■ To be guilty of mail or wire fraud, "defendants must have used the mail or wires as a means to obtain money or property by means of false or fraudulent pretenses, representations, or promises or for purposes of executing a scheme to defraud." *O'Malley v. New York City Transit Authority*, 896 F.2d 704, 706 (2d Cir. 1990); *see United States v. Gordon*, 780 F.2d 1165, 1170 (5th Cir.1986) (wire fraud); *United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir.), *cert. denied*, 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986) (mail fraud). "The term 'scheme to defraud' connotes some degree of planning by the perpetrator[s], [making] it [ ]essential that the evidence show the defendant[s] entertained an intent to defraud." *Soper v. Simmons Int'l, Ltd.*, 632 F.Supp. 244, 250 (S.D.N.Y.1986) (citations omitted). A showing of intentional fraud or reckless indifference to the truth is a necessary element of allegations under the mail and wire fraud statutes. *O'Malley*, 896 F.2d at 707; *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir.1987), *cert. denied*, 484

U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

The Amended Complaint does not set forth any specific uses of interstate mail or wire communication in support of their claims of mail and wire fraud, instead generally invoking "the acts set forth above" in support of its mail and wire fraud claims. Amended Complaint ¶ 78. However, granting the Amended Complaint a liberal reading, which this Court must do on a motion to dismiss, *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986), the Court will apply this blanket allegation to each of the factual incidents in the Amended Complaint where interstate mail, wire or radio communications might have taken place.

■ The Amended Complaint refers to certain correspondence from the Coop Corporations to the Banks in support of the Banks' allegations that defendants used the mails or wires in furtherance of their fraudulent scheme, as follows: The March 19, 1990 letter valuing the properties at a total of $45 million (discussed *ante*); June 20, 1990 letters from the Coop Corporations advising the Banks of the transfer of the Unsold Shares and Proprietary Leases of the Unsold Units to the Holding Corporations; August 1, 1990 letters from the Coop Corporations to the Banks notifying them of their default and defendants' intention to terminate the Unsold Shares and Proprietary Leases; August 15, 1990 letters from the Coop Corporations to the Banks again informing them of their default and advising them that the Unsold Shares and Proprietary Leases would be cancelled and sold at auction; and September 17, 1990 letters from the Coop Corporations to the Banks telling them the Unsold Shares and Proprietary Leases had been terminated and the public auction had been scheduled (the "Notices of Sale").[20] Amended Complaint, ¶¶ 33, 34, 36.

---

**20.** Plaintiffs' counsel, in its Memorandum of Law in Opposition to the instant motion, counts among the instances of mail and wire fraud certain filings by the Sponsors with the Attorney General: one, dated May 31, 1990, in which the Sponsor Defendants allegedly stated that they

intended to continue to pay maintenance and Loan payments funded in part by the statutory rents (Br. at 44, citing Amended Complaint at ¶ 30); and another, dated September 17, 1990, which allegedly disclosed that the Dummy Corporations—not the Sponsors—held the Unsold

These references fail to provide facts to support allegations that defendants knowingly used the interstate mails or wires to defraud the Banks, for the simple reason that the Amended Complaint does not properly allege a scheme to defraud. The Court has already found that Sponsors' alleged course of conduct does not constitute a scheme to defraud because there is no proper allegation that defendants made knowing misrepresentations at the outset. Because the Amended Complaint is devoid of specific facts to support allegations of a fraudulent scheme, none of the letters referred to in ¶¶ 33, 34, or 36 could be said to be interstate mail or wire communication in furtherance of such a scheme. A scheme to defraud is an essential element of mail and wire fraud under the above-quoted statutes. The Amended Complaint therefore fails to state a claim for mail or wire fraud as predicate acts of racketeering activity.

The Banks' allegations of bank fraud may be similarly disposed of. In order to maintain a claim for bank fraud, plaintiffs must show that defendants knowingly "engaged in a scheme to defraud a federally chartered or insured financial institution, or (2) participated in a scheme to obtain money under custody or control of a federally chartered or insured financial institution by means of material, false statements or representations." *United States v. Cloud*, 872 F.2d 846, 850 & n. 4 (9th Cir.1989) (citing *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987)).[21] For reasons discussed above with respect to the allegations of securities, mail and wire fraud, the Amended Complaint does not set forth sufficient facts to support its allegations that defendants' representations, made to the Banks in order to induce them to lend Sponsors money or to forbear upon exercising their rights of foreclosure, knowingly misstated or omitted any material fact at the time of the representation. *Cf. Cloud*, 872 F.2d at 851 (defendant's signature of mutual escrow instructions, knowing that they contained materially false representations as to sale price and down payment figures, violated statute). Because there was no fraudulent scheme, there can be no claim for bank fraud as a predicate act. 18 U.S.C. § 1344(a).

As a policy matter, plaintiffs' securities, mail, wire and bank fraud allegations should be dismissed because their theory of defendants' alleged scheme to defraud "defies logic." *Atlantic Gypsum Co.*, 753 F.Supp. at 514. In *Atlantic Gypsum* this Court dismissed, for lack of scienter, RICO allegations against a consortium of lenders which purportedly used fraudulent means to try to gain control over a borrower venture. The Court found that "on plaintiffs' view of the facts, defendants advanced money to the venture with the intention of driving it into the ground so that they could control the failed venture and then wait in line with other creditors in a bankruptcy proceeding.... Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986)).

Similarly, on the Banks' view of the facts in this case the defendants fraudulently induced the Banks to lend them $27 million just so that they could pay out that sum (and more) in principal, interest, and maintenance payments before defaulting. Such a scheme would be economically unreasonable, and the Court cannot reasonably infer fraudulent motive under these circumstances.

Because the Amended Complaint has not properly alleged any predicate acts of securities, mail, wire or bank fraud under RICO, it cannot state a viable RICO claim.

Shares (Br. at 44, citing Amended Complaint at ¶ 38). However, the Amended Complaint itself does not allege that either of these filings traversed the interstate mails or wires.

**21.** The statutory definition of bank fraud is the knowing execution of "a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys ... under the control of a financial institution, by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1344(a) (Supp.1989).

Thus the seventh claim must be dismissed pursuant to Rule 12(b)(6). Because the eighth claim pleads a conspiracy to commit the acts described in the seventh, it too must be dismissed.

### III.   State Law Claims

 The Court has the discretion to dismiss plaintiffs' pendent state law claims for lack of subject matter jurisdiction [22] when it dismisses all of the federal question claims in a complaint. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Cahill v. Arthur Andersen & Co.*, 659 F.Supp. 1115, 1128 (S.D.N.Y.1986), *aff'd*, 822 F.2d 14 (2d Cir.1987). Here, each of the Banks' federal claims, numbered one, two, seven and eight, have been dismissed.[23]

In the interest of comity, the Second Circuit instructs that "absent exceptional circumstances," where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should "abstain from exercising pendent jurisdiction." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *see Coalition Against Columbus Center v. City of New York*, 750 F.Supp. 93, 96 (S.D.N.Y.1990). Factors to be considered by the Court include (1) the length of time the matter has been pending before the federal court; (2) the proximity of the trial date; and (3) the predominance of issues of federal, as opposed to local, concern. *McLearn v. Cowen & Co.*, 660 F.2d 845 (2d Cir.1981) (no federal district court jurisdiction where no trial held, no substantial investment of time and energy on state law issue, and state claim was not closely tied to questions of federal policy).

Because the case is in its beginning stages, no trial date has been set, and the state claims do not involve questions of federal policy, the Court will dismiss plaintiffs' state law claims with leave to refile in state court. *See Coalition Against Columbus Center*, 750 F.Supp. at 96.

### IV.   Declaratory Judgment

Because this Court lacks subject matter jurisdiction pursuant to 12(b)(1) of the Federal Rules of Civil Procedure, the Banks' thirteenth claim for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 is dismissed.

### CONCLUSION

For the reasons set forth above, the Banks' securities fraud and RICO claims are dismissed with prejudice for failure to state a claim pursuant to Rule 12(b)(6). The Court lacks subject matter jurisdiction pursuant to Rule 12(b)(1) to entertain the Banks' request for declaratory judgment, and declines to exercise jurisdiction over plaintiffs' state law claims. Accordingly, claims one, two, seven and eight are dismissed with prejudice; and claims three, four, five, six, nine, ten, eleven, twelve and thirteen are dismissed without prejudice to refile in state court.

SO ORDERED.

---

**22.** There is no diversity jurisdiction between these parties. *See* Amended Complaint, ¶ 1.

**23.** The Banks' third, fourth, fifth, sixth, ninth, tenth, eleventh and twelfth claims are state law claims.