In re WINDSOR PLUMBING SUPPLY
CO., INC., Debtor.

In re WINDSOR SHOWROOM,
INC., Debtor.

In re WINDSOR WORLD, INC.
a/k/a ABC Distribution
Associates, Debtor.

Bankruptcy Nos. 190–10224–352, 190–11082–352 and 190–11123–352.

United States Bankruptcy Court,
E.D. New York.

July 7, 1994.

510

Leo Fox, New York City, for debtors.

Chadbourne & Parke, New York City, for Cofacredit, S.A.

Platzer, Fineberg & Swergold, New York City, for Creditors Committee.

### DECISION ON APPLICATION
### TO ESTIMATE CLAIM

MARVIN A. HOLLAND, Bankruptcy Judge:

This is a claims estimation proceeding brought on by the creditor, Cofacredit, S.A. [hereinafter "Cofacredit", "Creditor", "Plaintiff", or "Claimant"] to establish the value of its claim against the debtors, Windsor Plumbing Supply Co., Inc., Windsor Showroom, Inc., and Windsor World, Inc. [hereinafter "Debtors" or "Defendants"], a wholesale dealer of plumbing fixtures and supplies and two retail plumbing supply operations respectively.

## I. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges for the Eastern District of New York dated August 28, 1986, found in Appendix 3 of *Acolyte Electric Corp. v. New York*, 69 B.R. 155, 186 (Bankr. E.D.N.Y.1986). This is a core proceeding pursuant to § 157(b)(2)(B).

## II. PROCEDURAL HISTORY

On August 27, 1990, Cofacredit filed a separate Proof of Claim against each of the Debtors in the amount of $3,502,860.[1] Each Proof of Claim was based upon the facts alleged in an Amended Complaint [hereinafter "Am.Compl. at ¶ __"] filed by Cofacredit in 1989 in the United States District Court for the Eastern District of New York against the Debtors and others. Each Proof of Claim has two components. The first is for $1,167,620, representing the amount claimed due from Windsor Plumbing Supply Co., Inc.

[hereinafter "Windsor Plumbing"] under certain invoices factored by Cofacredit for merchandise allegedly shipped to Windsor Plumbing from France. The second component of each Proof of Claim is based upon treble damages under the Racketeer Influenced and Corrupt Organizations Act [hereinafter "RICO"].

Since the amount of the claim was unliquidated, the Creditor had the option of liquidating its claim either by vacating the stay as to its district court action and proceeding to a verdict, or by having this Court estimate the value of its claim. On February 2, 1992, Cofacredit made a motion to have this Court estimate the value of its claim pursuant to 11 U.S.C. § 502(c)(1). The Court granted the motion. Both the Debtors and Cofacredit waived a hearing and elected to have the Court make its estimate based upon submitted papers.

## III. BACKGROUND

This case arises out of an international invoice factoring agreement [hereinafter "Factoring Agreement"] between Holleville et Duverger [hereinafter "HED–France"] a French plumbing fixture concern and Cofacredit, a French financial services company. Sholam Weiss, the sole shareholder of Windsor Plumbing, entered into an agreement [hereinafter "Distribution Agreement"] with HED–France and formed Holleville et Duverger U.S.A., Inc. [hereinafter "HED–USA"], to market French plumbing fixtures in the United States. Meanwhile, HED–France factored Cofacredit's invoices representing claimed sales of plumbing fixtures to Windsor Plumbing. Windsor Plumbing denied liability for payment on the invoices, claiming that there were no sales of inventory to it since the inventory had been received on consignment to HED–USA. Cofacredit thereafter filed an action against Windsor Plumbing and others, which is presently

---

**1.** Although the creditor filed a separate identical claim against each of the three debtors, in their submissions herein neither side discussed the extent to which any of the causes of action which are the subject of the claims may have a different impact upon each of the separate debtors. Plaintiff's submission in response to Pretrial Order at 2–3 asserts joint and several liability on the basis

of debtor's Fifth Amended Plan of Reorganization. Debtor's submission does not address this issue. Therefore, for purposes of this estimation proceeding, we have treated the three claims as a single claim against a consolidated debtor. Since the parties have sought merely a number without an apportionment analysis, that is all that we have sought to provide.

pending in the United States District Court for the Eastern District of New York.

## A. *THE PARTIES*

The Plaintiff in the action out of which this estimation proceeding arose, Cofacredit, is a Paris, France-based financial services company. (July 9, 1992 "Statement of Facts, Both Disputed and Undisputed Being Asserted by Each of the Parties" (Plaintiff's statement) ¶ 56 [hereinafter "Pl.['s] SOF" at ¶ __ or "Debtors' SOF" at ¶ __].) [2] During 1987 and 1988, Alain Jarry [hereinafter "Jarry"], and in 1988 Philippe Berthelier [hereinafter "Berthelier"], were executives of Cofacredit. (Pl.['s] SOF at ¶ 63.)

The Defendants in the district court action are the Debtors, Windsor Plumbing, a Brooklyn-based plumbing wholesaler; Windsor World, Inc. [hereinafter "Windsor World"], a plumbing retailer with a showroom in Manhattan; (Debtors' SOF at ¶¶ 4–5), HED–USA, the Brooklyn-based company set up to market HED–France products in the United States; and Sholam Weiss, the controlling shareholder, officer, and director of HED–USA in 1988. (Debtors' SOF at ¶ 3.) Sholam Weiss was also the sole stockholder and officer of Windsor Plumbing in 1987 and 1988, and both a controlling stockholder and officer of Windsor World. The parties differ slightly as to Mr. Weiss' various positions. During 1988, Moses Weiss and Hersch Lipszyc [hereinafter "Lipszyc"] were employees of HED–USA. Moses Weiss was also an officer of Windsor Plumbing. However Cofacredit, who named them as parties to the action, claims that Lipszyc and Moses Weiss held additional titles in Windsor World and Windsor Plumbing. (Debtors' SOF at ¶¶ 8–9.)

Also named as a Defendant is HED–France, a French company with a place of business in Bethencourt-sur-mer, France. HED–France was in the business of designing, manufacturing, and selling deluxe kitchen and bathroom brass faucets and hardware. In 1987 and 1988, Erich Brandli [hereinafter "Brandli"] was a key executive of HED–France and represented himself as its president, according to the Debtors, (Debtors' SOF at ¶ 10.) Although Cofacredit acknowledged only that Brandli was a key executive and no more. (Pl.['s] SOF at ¶ 64.)

## B. *THE EXCLUSIVE DISTRIBUTION AGREEMENT*

The relationship between HED–France and the Weiss brothers began in January, 1988 when Moses Weiss met Brandli in a Paris trade show where HED–France was an exhibitor. (Debtors' SOF at ¶ 11.) Brandli told Moses Weiss that HED–France had some inventory in a St. Louis warehouse which it was unable to sell. (Debtors' SOF at ¶ 12.) He asked Moses Weiss whether Windsor Plumbing would evaluate the products for the United States market. (Debtors' SOF at ¶ 13.) Windsor Plumbing agreed, and in January 1988, HED–France shipped the products from St. Louis to Windsor Plumbing's warehouse in Brooklyn. (Debtors' SOF at ¶ 14.) Windsor Plumbing evaluated the products and advised HED–France that the products in their present state were unsuitable for the United States market, but that they could be successfully modified. (Debtors' SOF at ¶ 15.)

Later in January 1988, Sholam Weiss agreed to redesign the products for use in this country, but only if HED–France would grant him an exclusive right to distribute the products of HED–France in the United States. (Debtors' SOF at ¶ 16.) In order to accomplish the distribution, Sholam Weiss set up a separate company. This was done to enable the HED–France products to be distributed to competitors of Debtors who might be reluctant to purchase from Windsor (Debtors' SOF at ¶ 18). Moreover, he believed that a new entity could raise the substantial capital necessary to cover the costs of packaging, storage space, and a marketing campaign. (Debtors' SOF at ¶ 17.)

**2.** Despite the pre-trial order in which the Court instructed the parties to submit a statement of undisputed facts, the parties were unable to agree on such a statement, and each side separately submitted its version of all facts. The Debtors' version of facts are numbered from 1 to 55 and the Plaintiff's are numbered 56 to 85.

## C. *THE DISTRIBUTION AGREEMENT*

According to the Debtors, Sholam Weiss arranged for the redesign of the HED–France line and negotiated a Distribution Agreement ultimately signed on March 17, 1988. (Debtors' SOF at ¶ 19.) The Debtors claim that Brandli travelled to the United States from France to sign this agreement on behalf of HED–France. *Id.* The Debtors further claim that the Distribution Agreement provided for HED–France to furnish HED–USA with a revolving inventory having a minimum value of two million dollars. (Debtors' SOF at ¶ 23.) The Debtors contend that HED–USA needed such a large inventory to enable it to make deliveries promptly without encountering the difficulties normally encountered when goods are imported only in response to orders. *Id.* The Debtors further contend that the warehouse of HED–USA was filled with HED–France products sent on consignment so that any obligation of payment by HED–USA would arise only if and when the consigned products were sold. *Id.*

The Debtors assert that HED–USA guaranteed to HED–France, minimum sales of $400,000 in 1988, $1,000,000 in 1989, $1,500,000 in 1990, $1,800,000 in 1991, and $2,000,000 in 1992. (Debtors' SOF at ¶ 24.) The Debtors also contend that HED–France agreed to replace all consignment inventory sold. *Id.* The Plaintiff makes no mention of the terms of the Distribution Agreement.

According to the Debtors, from January though March 1988 while the Distribution Agreement was being negotiated, HED–France shipped merchandise to the United States in closed 4–foot by 4–foot crates which were to be stored unopened in Windsor Plumbing's warehouse until the HED–USA warehouse was established. (Debtors' SOF at ¶ 25.)

The Debtors maintain that in early March 1988, Brandli telephoned Sholam Weiss from France requesting an advance of funds against the minimum sales guaranteed under the Distribution Agreement. (Debtors' SOF at ¶ 31.) The Debtors assert that Brandli requested these funds be used to help offset costs incurred in the modification of the plumbing fixtures for the United States market. *Id.* The Debtors claim that the funds were to be paid to Societe Generale, the bank to whom HED–France allegedly owed money under a direct loan. (Debtors' SOF at ¶ 32.) The Debtors further claim Brandli also asked Sholam Weiss to advise Societe Generale that funds would be forthcoming once a Distributorship Agreement was signed. (Debtors' SOF at ¶ 33.) The Debtors assert that neither Brandli nor anyone at HED–France mentioned the factoring of invoices to Cofacredit. (Debtors' SOF at ¶ 32.) The Debtors also contend that on March 9, 1988, Sholam Weiss advised Societe Generale of the advance of funds upon consummation of the consignment Distribution Agreement. (Debtors' SOF at ¶ 33.) The Debtors assert that the Distribution Agreement was signed on March 17, 1988 and that HED–USA wired $131,023.00 to HED–France's account at Societe Generale. The Debtors claim that the Societe Generale account was not a special factoring account, which would have been the case had such a Factoring Agreement been in existence and properly maintained. (Debtors' SOF at ¶ 36.) Cofacredit, however, declares that Brandli never confirmed the existence or validity of the Consignment Agreement and referred to it as merely a draft. (Pl.['s] SOF at ¶ 83.)

## D. *THE FACTORING AGREEMENT*

Cofacredit states that on February 17, 1988, it entered into a Factoring Agreement with HED–France pursuant to which HED–France was permitted to assign invoices for various customers to Cofacredit in return for payments from Cofacredit based upon the amount of the invoices. (Pl.['s] SOF at ¶ 65.) The Debtors allege that without their knowledge, prior to the signing of the Factoring Agreement, HED–France had obtained insurance to cover Windsor Plumbing invoices, with Coface, a separate French corporation insuring French export sales. (Debtors' SOF at ¶ 27.) Windsor Plumbing also contends that Cofacredit did not review Windsor Plumbing financial statements before entering into the Factoring Agreement, nor did it confirm the existence of the invoices allegedly now owed by the Debtors. (Debtors' SOF at ¶ 28.)

Cofacredit claims that as part of the Factoring Agreement, HED–France executed *quittances subrogatives* (assignment receipts) whereby all of HED–France's rights to receive payment were assigned to Cofacredit, and in addition, HED–France was obligated to send letters to the customers informing them of the assignment. (Pl.['s] SOF at ¶ 66.) Cofacredit further claims that it not only had in place extensive procedures for notifying those companies whose invoices had been factored, but also that Jarry, an employee of Cofacredit, met with an employee of HED–France and explained his part in those procedures. (Pl.['s] SOF at ¶ 67.) The Debtors deny having received such letters, and point out that Cofacredit is unable to produce any confirmation of such notice. (Debtors' SOF at ¶ 30.)

On April 8, 1988 HED–France began assigning to Cofacredit a series of invoices purporting to represent sales of plumbing products from HED–France to Windsor Plumbing. These invoices supposedly covered shipments made from HED–France from April 5, 1988 through September 23, 1988. These invoices aggregate $1,167,620.00. (Pl.['s] SOF at ¶ 68; Resp. Ex. 5.)

On April 15, 1988, Cofacredit sent a written "verification of account" to Windsor Plumbing informing it of the Factoring Agreement and listing the invoices that had been factored up to that point. Cofacredit claims that Windsor Plumbing raised no objection to this letter. Windsor Plumbing does not mention the April 15, 1988 letter at all. (Pl.['s] SOF at ¶ 69.)

Cofacredit further claims that its representative, Beatrice Courtemanche, telephoned Lipszyc at Windsor Plumbing on July 12, 1988 to inquire when payment would be made on the invoice due July 15, 1988, and followed up with a confirming letter. Again, Windsor Plumbing is silent as to Ms. Courtemanche's July 12, 1988 letter and telephone call. (Pl.['s] SOF at ¶ 70.)

### E. THE PARIS MEETINGS

Both Cofacredit and the Debtors assert that several meetings were held in Paris. However, their accounts of what transpired at those meetings differ. One such meeting occurred on July 26, 1988 in Paris at Cofacredit's offices. Cofacredit contends that Lipszyc attended on behalf of Windsor Plumbing, Brandli appeared for HED–France, and Jarry represented Cofacredit. (Pl.['s] SOF at ¶ 71.) Cofacredit asserts that the purpose of the meeting was to discuss the terms of payment for the invoices, and that during the meeting various terms for payment were negotiated. Cofacredit also contends that payment negotiations continued after the meeting, and that Cofacredit factored an additional $320,000 of invoices from July 26, 1988 through September 23, 1988. (Response of Cofacredit to the Debtors' Renewed Motion, Ex. 5 [hereinafter "Resp."].)

Windsor Plumbing asserts that Lipszyc was in Paris to discuss advertising brochures with Brandli, and that during this visit Brandli asked Lipszyc to accompany him to Cofacredit. However, Windsor Plumbing contends that Cofacredit's identity was unknown to Lipszyc at the time. (Debtors' SOF at ¶ 38.)

The next Paris meeting occurred on August 4, 1988. Cofacredit contends that the Windsor Plumbing representatives never raised any objection to the Factoring Agreements and never told Cofacredit that the sales were on consignment. (Pl.['s] SOF at ¶ 77.) Cofacredit claims that it telecopied letters confirming the discussions to Windsor Plumbing on August 12, 17, and 31, 1988. Those discussions allegedly concerned the Debtor's promise to furnish letters of credit to cover the balance owed on the invoices. (Pl.['s] SOF at ¶ 78.)

Windsor Plumbing again denies knowing the nature of the meetings, claiming that the entire meeting was conducted in French, and that Moses Weiss, who merely accompanied Brandli to this meeting, did not speak French. (Debtors' SOF at ¶ 39.)

### F. HED–USA WIRING OF FUNDS TO FRANCE

After the August meeting, Sholam Weiss agreed to send HED–France additional funds it needed to finance the manufacture of additional molds for the product line.

Brandli again asked Sholam Weiss to inform Societe Generale that funds were forthcoming, which Sholam Weiss did. The Debtors contend that Brandli still had not told them of the Factoring Agreement with Cofacredit, and that they remained unaware of it. (Debtors' SOF at ¶ 40.)

On August 21, 1988, HED–USA wired $232,292.00 to HED–France bringing the total advance to $363,317.00 against the $400,-000 minimum sales guarantee. The funds came from a Bank Leumi line of credit issued to HED–USA and were wired directly into HED–France's account. (Debtors' SOF at ¶ 41.)

Windsor Plumbing claims that it was not until September 1988 that Sholam Weiss learned about the Factoring Agreement in a telephone call with Brandli. (Debtors' SOF at ¶ 42.) Brandli also told Weiss that Cofacredit refused to purchase any additional invoices and that HED–France had no funds for further production. The Debtors contend that HED–USA had a considerable investment in the Distribution Agreement; it had leased and renovated a warehouse of 20,000 feet; developed special packing materials, cartons, and brochures; prepared lists and schedules of prices; and a computer program to facilitate the sale of HED–France products in the United States and Canada. (Debtors' SOF at ¶ 43.)

### G. *THE NOVEMBER 1988 NEW YORK MEETING*

In the wake of discovering HED–France's imminent financial demise, the Debtors declare that Sholam Weiss suggested that Cofacredit, HED–USA, and HED–France meet in New York to try and save the investment. (Debtors' SOF at ¶ 43.) However, Cofacredit asserts that the purpose of the November meeting was to obtain payment on the invoices, which it had been trying to do without success throughout October, 1988. (Pl.['s] SOF at ¶ 82.)

On November 6, 1988, Sholam Weiss, Moses Weiss, Lipszyc, Brandli, and Berthelier met in Manhattan at Windsor World's showroom. Cofacredit maintains that at the New York meeting it learned for the first time about the existence of HED–USA. This re-alization came about only because Berthelier noticed a sign in the showroom with the name "Holleville et Duverger U.S.A., Inc." Cofacredit also claims that it first learned of the Distribution Agreement at this point. It concedes, however, that Brandli had admitted that the agreement was only in draft form. The Debtors claim, however, that Sholam Weiss had given Berthelier a copy of the Distribution Agreement. (Debtors' SOF at ¶ 44.)

The Debtors claim that at this meeting, it first learned of the terms of the Factoring Agreement and received a list of invoices. Sholam Weiss also claims that negotiations to keep HED–France alive continued, and that HED–USA offered to give ten promissory notes each in the amount of $100,000 to HED–France as an accommodation to Cofacredit. Sholam Weiss thereafter delivered those notes, even though Cofacredit found them unacceptable at the November 1988 meeting. (Cofacredit does not mention the content of any such negotiations.) (Pl.['s] SOF at ¶ 83.)

A few weeks after the New York meeting, on November 23, 1988, Cofacredit filed a complaint against The Debtors and others in the United States District Court for the Eastern District of New York. (Debtors' SOF at ¶ 49.)

### H. *THE WINDSOR WORLD PUBLIC OFFERING*

At the time of the negotiations with Cofacredit, Windsor World was initiating a public offering. On December 30, 1988 the Securities and Exchange Commission approved the final prospectus of Windsor World. (Debtors' SOF at ¶ 51.)

Two weeks later, on January 11, 1989, Cofacredit amended its complaint to add Windsor World as a defendant. The basis for adding Windsor World, was the claim that Windsor World had participated in a scheme to defraud Cofacredit by showing the goods shipped to HED–USA as its inventory. It is claimed that they did this to obtain a cost-free inventory which would artificially inflate its assets and thereby enhance the prospects of a successful public offering.

The Debtors claim that Cofacredit's attorneys had been advised that these goods had not been listed anywhere as an asset of Windsor World. (Debtors' SOF at ¶ 52.)

On January 12, 1989, five days before the scheduled due diligence meeting with Windsor World's underwriter, Cofacredit delivered copies of the Amended Complaint to the underwriter, Levco Securities Corp., and to the Securities and Exchange Commission. The public offering was thereafter aborted. (Debtors' SOF at ¶ 55.)

## I. *COFACREDIT'S CLAIMS*

Cofacredit's claim is comprised of two components. The first component of the claim is stated in the alternative for $1,167,620, and consists of the amount Cofacredit alleges Debtors owed it as a result of Cofacredit's having factored invoices generated from sales of plumbing supplies from HED–France to Debtors. Cofacredit claims the invoices were properly factored, monies were paid to HED–France, goods were shipped to Debtors, and thus Debtors are liable to Cofacredit for the face amount of those invoices. Cofacredit makes several arguments in the alternative to support its right to claim the $1,167,620. First, Cofacredit denies the validity of a consignment contract between HED–France and HED–USA. Cofacredit seems to argue that, absent a consignment contract, a direct sale had occurred and it should be able to collect the $1,167,620 on a simple "demand for payment" (Am.Compl. at ¶¶ 36–39) or on a theory of "account stated" (Am.Compl. at ¶¶ 40–43).

In the alternative, assuming the validity of the consignment contract, Cofacredit seeks recovery on a theory of common law fraud, alleging that Debtors made a variety of false representations to induce Cofacredit to purchase and accept the assignment of valueless invoices arising from the apparent sale of plumbing supplies from HED–France to Debtors. (Am.Compl. at ¶¶ 22–31.) In addition, Cofacredit also argues that Debtors were part of a conspiracy to defraud it. (Am.Compl. at ¶¶ 32–33.) Furthermore, Cofacredit asserts as an alternative to common law fraud, that Debtors are equitably estopped from denying liability for the value of the factored invoices. Cofacredit contends that Debtors had a duty to notify it as soon as Debtors became aware that Cofacredit was accepting the assignment of invoices for merchandise that HED–France had consigned rather than sold to Debtors. (Resp. at 33–41.)

The second component of Cofacredit's claim is based upon $3,502,860 of treble damages under RICO, 18 U.S.C. §§ 1961–1968. Cofacredit asserts that Debtors and others, through two or more acts of mail and wire fraud constituting a pattern of racketeering activity, directly maintained an interest in an enterprise, the activities of which affect interstate commerce. (Am.Compl. at ¶¶ 15–21.)

## IV. *DECISION*

For the reasons stated below, this Court estimates that the claim of Cofacredit has a value of $145,000.

## V. *PROCEDURE ADOPTED*

Ordinarily, courts make findings of fact after hearing evidence on contested issues of fact. However, in this case, the parties waived their rights to a hearing, and instead, requested that the Court make its decision based upon their written submissions summarized above. Therefore, what follows are not traditional findings of fact. Rather, we have attempted to sort out the facts asserted by each side. We have then taken those facts agreed upon by each side and used them to evaluate the likelihood of the validity of those assertions for which there is no agreement, giving greater credence to facts asserted by one side and not addressed by the other, than to facts which are specifically disputed. Where versions conflict, we have attempted to resolve such conflict by adopting that version which is more consistent with the facts not in dispute, and which seems to us to be more likely in view thereof.[3] We have then attempted to determine the probability of each side's success before a

---

**3.** "It is truth very certain that when it is not in our power to determine what is true, we ought to follow what is most probable." Rene Descartes, as quoted in *The World of Mathematics*, p. 1360, James R. Newman, Editor, Simon & Schuster, 1956.

traditional trier of fact. Without having taken testimony, we can make no findings of fact to support conclusions of law. What follows, therefore, are what we call illations or inferences [hereinafter "INF" at ¶ ___], facts which we believe that a trier of fact would find and rely upon to reach its ultimate conclusions after having made an analysis similar to ours. We then statistically analyze the probability of various possible outcomes in order to assign an estimated dollar value to the claim. In doing so we have considered the possibility that some of the causes of action might not survive a motion to dismiss made either before trial or after the close of plaintiff's case.

## VI. *INFERENCES*

1. Windsor Plumbing Supply Co., Inc., a wholesale dealer of plumbing supplies, is a New York corporation located at 886 Dahill Road, Brooklyn, New York. (Debtors' SOF at ¶ 4.)

2. Windsor World, Inc., is a New York corporation located at 250 East 59 Street, New York, New York. (Debtors' SOF at ¶ 5.)

3. HED–USA is a New York corporation located at 1450 37th Street, Brooklyn, New York. (Debtors' SOF at ¶ 3.)

4. Cofacredit, S.A. is a French corporation having its place of business in Paris, France. Cofacredit provides financial services, including the factoring of invoices for French manufacturing concerns. (Pl.['s] SOF at ¶ 56.)

5. Coface is a French corporation, distinct from Cofacredit, that insures French export sales. (Debtors' SOF at ¶ 2.)

6. Societe Industrielle et Commerciale Holleville et Duverger is a French Corporation with its place of business at Bethencourt–sur–Mer, France. This company is in the business of designing, manufacturing, and selling deluxe kitchen and bathroom hardware. (Debtors' SOF at ¶ 6.)

7. Societe General is a major French bank with branch offices throughout that country. The bank has a branch office in Abeville, where HED–USA had its corporate bank account. (April 10, 1989 Affidavit of Sholam Weiss at 11.)

8. Mr. Girr is an employee of Societe General. (Debtors' Pre-trial Submission Ex. C.)

9. During 1988, Sholam Weiss was an officer, director, and controlling shareholder of HED–USA. During the period 1987–88, he was both an officer and sole stockholder of Windsor Plumbing. He was also an officer and controlling stockholder of Windsor World. (Debtors' SOF at ¶ 8.)

10. During 1988, Lipszyc was an employee of HED–USA. (Debtors' SOF at ¶ 9.) He was also the Administrative Vice President of Windsor World and an employee of Windsor Plumbing. (Lipszyc Deposition of April 4, 1989 at 4–5.)

11. During 1988, Moses Weiss was an officer of Windsor Plumbing and also an employee of HED–USA. (Debtors' SOF at ¶ 9.)

12. During 1987–88, Brandli was a key executive of HED–France and an officer of the company. (Debtors' SOF at ¶ 10; Am. Compl. at ¶ 9; Resp.Ex. 19—November 13, 1989 affidavit of Philippe Berthelier at ¶ 2.)

13. HED–France began to ship merchandise to Windsor Plumbing in October 1987. (Resp.Ex. 9, April 10, 1989 Affidavit of Sholam Weiss at 2.)

14. HED–France obtained export insurance covering the unpaid balance factored in an amount of FrF 8,000,000 (approximately $1,200,000) from Coface by February 1, 1988. (Resp.Ex. 7, November 13, 1988 Affidavit of Jarry ¶ 6.)

15. HED–France entered into a Factoring Agreement with Cofacredit on February 17, 1988. *Id.* at ¶ 7. This was an exclusive Factoring Agreement and prohibited HED–France from factoring invoices to Windsor Plumbing/HED–USA with any other financial institution. (Resp.Ex. 6, at ¶ 1 in Factoring Agreement.)

16. HED–France did not begin factoring invoices from Windsor Plumbing with Cofacredit until April 5, 1988 and no further factoring occurred after September 23, 1988.

(Resp.Ex. 7, November 13, 1988 Affidavit of Jarry at ¶ 9.)

17. Cofacredit received Windsor's financial statements from the French embassy rather than from Windsor directly. This fact is uncontested. (May 12, 1989 Deposition of Sholam Weiss at 28–30.)

18. Cofacredit did not review the financial statements of Windsor Plumbing. (Debtors' SOF at ¶ 28.) Cofacredit says the financial statements were delivered to it, but not that it reviewed them. (Am.Compl. at ¶ 27.)

19. Debtors received goods from HED–France. (Debtors' SOF at ¶ 25.) This is an uncontested fact.

20. The goods that the Debtors received from HED–France were not readily marketable in the United States. (Debtors' SOF at ¶ 15.)

21. The total value of all Windsor Plumbing invoices that HED–France factored with Cofacredit is $1,167,620. (Am.Compl. at ¶ 27.)

22. Between October 1987 and the end of March 1987, HED–France factored, or otherwise pledged, $659,509 worth of Windsor Plumbing invoices to Societe Generale. (Resp. at ¶ 23; Ex. 16.) This figure contains Invoice Nos. 122219 and 19008. (Resp. at ¶ 24; Ex. 17.) None of the numbers on the invoices referred to here are found in the comprehensive list of invoices comprising the claim of Cofacredit. (Resp. Ex. 5.)

23. On or about March 17, 1988, Brandli, an officer of HED–France, signed a document purported to be a consignment agreement between HED–USA and HED–France. Brandli's signature is clearly visible within the corporate stamp of HED–France. (Debtors' Pre-trial Submission Ex. B; Resp. Ex. 11, April 4, 1989 Deposition of Lipszyc at 35; Resp.Ex. 19, November 13, 1989 Affidavit of Berthelier at ¶ 5.)

24. Debtors paid $363,317 to HED–France in accordance with the Consignment Agreement. (Debtors' SOF at ¶ 41.) This is an uncontested fact.

25. Debtors never acknowledged the validity of the invoices on which Cofacredit bases its claims. (Debtors' SOF at ¶ 30.)

Cofacredit neither produced nor offered to produce any documents showing that the Debtors accepted liability on the invoices from HED–France.

26. A Cofacredit computer printout showing invoices HED–France submitted to Cofacredit, indicates that no payment on any of the factored invoices was due before September 15, 1988. (Resp.Ex. 5.) Cofacredit also submitted two documents that instead show payments first due in July. (Resp.Ex. 8, 10.) Payment terms were generally 150 days. (Pl.['s] SOF at ¶ 68.) The invoices allegedly due in July were issued in April and thus properly due in September, absent further explanation. Cofacredit supplied no explanation for the earlier payment dates; we therefore conclude that the September date is correct.

27. On or about August 1, 1988 the Defendants knew that HED–France was factoring Windsor Plumbing invoices with Cofacredit. (Resp.Ex. 9, April 10, 1988 Affidavit of Sholam Weiss ¶ 17. *But see* Debtors' SOF at ¶¶ 42, 44.)

28. Until at least August 12, 1988, the Defendants were not aware that Societe Generale and Cofacredit were indeed distinct institutions. The August 12, 1988 letter addressed to Mr. Girr[ ], an employee of Societe Generale but directed to Cofacredit, is evidence of this confusion. (Resp.Ex. 14.) Clearly, Lipszyc was confused on this point as well. (April 4, 1989 Deposition of Lipszyc at 59–60.) Undoubtedly, Cofacredit added to this confusion when it sent a telex to the Defendants asking for payment of Invoice No. 122219, which was in fact a receivable of Societe Generale. (Resp.Ex. 12, 17; INF at ¶ 22.)

29. Debtors claim that during the meetings of July and August 1988, having just been informed of the HED–France factoring, they offered to have HED–USA advance funds to HED–France against its minimum sales obligation as an accommodation and in order to relieve the financial pressure on HED–France. Between July 26, 1988 and August 21, 1988, correspondence passed between the Plaintiff, Defendants, and Societe Generale in an attempt to effect this accom-

modation. (Resp. Ex['s] 12–17.) Claimant contends that Lipszyc merely pressed for an extension of time for Windsor Plumbing to pay the factored invoices and that such a request constituted a tacit admission of liability. (Pl.['s] SOF at ¶ 71–73, 76.) The Debtors' version of these events is by far the more credible. If the Debtors were involved in an elaborate scheme to defraud Cofacredit, they certainly would not have admitted liability on the invoices; they had nothing to gain by doing so. If the Debtors simply denied owing the money represented by the factored invoices, at worst Cofacredit would have ceased further invoice factoring. Having the alleged scheme halted in this way would surely have been less detrimental than acknowledging a liability in excess of one million dollars. Moreover, such an admission by the Debtors would have been totally at odds with their consistently voiced position that HED–USA had been receiving merchandise only on consignment.

30. Debtors offered to issue letters of credit as a result of the discussions in July and August 1988. (Pltf.['s] SOF at ¶ 78.) This is an uncontested fact.

31. Sholam Weiss made a contribution of inventory to Windsor World in the amount of $2,499,840. Claimant's action in the district court alleges that a substantial portion of this inventory consisted of merchandise from HED–France, invoices for which had been factored by it. Nothing has been offered in this proceeding to buttress such a position. On the other hand, Sholam Weiss specifically denied that his contribution to Windsor World contained any inventory manufactured by HED–France. (Resp.Ex. 23) In addition, Mayer Rispler, the accountant to Windsor World, supports Mr. Weiss' statement.[4]

## VI. *DISCUSSION*

### A. *ESTIMATION*

11 U.S.C. § 502(c)(1) provides in relevant part:

> There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be would unduly delay the administration of the case ...

■ Neither the Code nor the Federal Rules of Bankruptcy Procedure provide any procedures or guidelines for estimation. However, courts addressing the issue have held that bankruptcy judges may use "whatever method is best suited to the particular contingencies at issue." *Bittner v. Borne Chemical Co.*, 691 F.2d 134, 135 (3d Cir. 1982); *See In re Baldwin–United Corp.*, 55 B.R. 885, 899 (Bankr.S.D.Ohio 1985). Judges must therefore fashion their own procedures. *In re MacDonald*, 128 B.R. 161 (Bankr. W.D.Tex.1991). In doing so, the Court is bound only by "the legal rules which may govern the ultimate value of the claim ... [and] those general principles which should inform all decisions made pursuant to the Code." *Bittner*, 691 F.2d at 135–36.

■ Bankruptcy courts have wide discretion in choosing the process for estimating a claim. The methods used by courts have run the gamut from summary trials (*Baldwin*, 55 B.R. at 899) to full-blown evidentiary hearings (*In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 65 (Bankr.E.D.Va.1982)) to a mere review of pleadings, briefs, and a one-day hearing involving oral argument of counsel. *In re Lane*, 68 B.R. 609, 613 (Bankr.D.Hawai'i 1986). Whatever the procedure the court chooses to estimate a claim, it must be consistent with the policy underlying Chapter 11, that a "reorganization must be accomplished quickly and efficiently." *Bittner*, 691 F.2d at 137 *citing* 124 Cong. Rec. H 11101–H 11102 (daily ed. Sept. 28, 1978). It may be sometimes be inappropriate to hold time-consuming proceedings which would defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue delay.

In this case, a review of the submitted documents is the procedural method selected. Both parties have requested that this Court estimate the Cofacredit claim upon submission, and the parties have submitted a joint statement upon which they have agreed that

---

4. The February 15, 1989 letter to Frank Cohen, then counsel to Cofacredit, from Mayer Rispler, CPA, accountant to Windsor World during the preparation of the prospectus in connection with its initial public offering. (Debtors' Unnumbered Submission)

this Court is to rely. Further, ample documentation has been submitted to enable this Court to make a reasonably informed determination. The parties have filed memoranda and affidavits, as well as statements of position and exhibits.

■ In determining exactly how to estimate the value of a claim, the bankruptcy court has broad discretion. The Court of Appeals for the Second Circuit has stated that courts should make a "speedy and rough estimation of [the] claims for purposes of determining [claimant's] voice in the Chapter 11 proceedings ..." *In re Chateaugay Corp.*, 944 F.2d 997, 1006 (2d Cir.1991). The Second Circuit's requirement for a "rough estimation" of the claim is in accordance with the view of other jurisdictions that:

> [a]n estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delaying the matter. *In re Nova*, 23 B.R. at 66.

■ In actually estimating the value of a claim, many courts have taken a binary approach; all or nothing. The party that carries its argument by a preponderance generally receives either a claim value of zero if the debtor prevails, or the full value of the claim if the claimant prevails. *Bittner*, 691 F.2d at 136. While such approach may be appropriate for a finder of fact, we do not believe that it is appropriate for a claim estimation proceeding. A trier of fact first determines which version is most probable and proceeds from there to determine an award in a fixed amount. An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by probability that it may be sustainable only in part or not at all.

The number of possible outcomes in this case ranges from a claim value of zero to the full amount demanded. The reason for the existence of such a variation in the possible outcomes is straight forward. While the magnitude of the plaintiff's loss may be fixed, liquidated and undisputed, the extent, if any, to which The Debtors caused such loss or otherwise may be liable therefore clearly is not. Where the extent of the liability is in question "[t]he jury enjoys substantial discretion in awarding damages within the range shown by the evidence." *Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir.1990).

■ An almost infinite number of different juries could be selected from the pool of available jurors. Each of these hypothetical juries would perceive the evidence in a different light and would evaluate it from a point of view arising out of different experience. Recognizing that the magnitude of recovery is to a large extent dependent upon the individual backgrounds of the triers of the facts, what we are given to deal with is a range of possible awards which we must first turn into a range of probable awards running from zero to the full amount of the claim. An *expected value* can then be found by multiplying a number of possible recovery values by the probability of their occurrence and taking the sum of these products.

For example, if a plaintiff claims it was defrauded out of $1,000, after a trial ten randomly-selected juries might award a range of recoveries. The court might estimate the probabilities of these various jury awards as follows:

| Amount of Possible Award | Probability | Expected Value |
| --- | --- | --- |
| $1000 | .2 | $200 |
| 750 | .6 | 450 |
| 250 | .1 | 25 |
| 0 | .1 | 0 |

TOTAL EXPECTED VALUE $675

In this example, if the court believed that two out of ten randomly-selected juries might grant the maximum award, six of the ten might award just $750, one of the ten might award $250, one of the ten might award nothing, then $675 is the statistically estimated value of the plaintiff's claim. The use of probabilities in estimating claims, rather than the more simplistic all-or-nothing approach, has been used by several courts. *In re Farley, Inc.*, 146 B.R. 748, 753–55 (Bankr. N.D.Ill.1992); *In re Federal Press Company*, 116 B.R. 650, 653–54 (Bankr.N.D.Ind.1989); *In re Lane*, 68 B.R. at 612–13. It is the

procedure we believe to be the most appropriate herein.

## B. DEMAND FOR PAYMENT/ACCOUNT STATED

Cofacredit seems to argue that, absent a consignment contract, the claimed shipment of goods to Debtors constitutes nothing more than sales in the ordinary course of business, and that therefore the Debtors owe it the face amount of the factored invoices. Cofacredit makes several arguments against the validity of the consignment contract. First, Cofacredit says the contract is so indefinite in its terms that it is nothing more than a mere non-binding draft. Second, it asserts that even if the draft were indeed a proper contract in form, it still would not be a proper contract in law since Brandli did not have authority under French law to sign a document binding HED–France. (Resp. at ¶¶ 12–13, 27.)

Apparently, assuming the invalidity of the alleged consignment contract, Cofacredit claims that the Defendants owe it $1,167,620 either on a theory of rightful "demand for payment" or on a theory of "account stated". For the reasons recited below, we are persuaded that the consignment contract between HED–France and HED–USA is in fact valid. Since we believe that a consignment contract existed, both the claim based upon rightful "demand for payment" and the one based upon "account stated" must fail.

### 1. THE CONTRACT

Cofacredit asserts that there was no manifestation of mutual assent between HED–France and HED–USA sufficient to constitute a contract. It urges that the consignment agreement had no legal force or effect since it was a mere draft or that even if the document were more than a draft, it was too indefinite and incomplete to constitute a valid, enforceable contract. Lastly, Cofacredit declares that even if the document were not too indefinite to be enforceable, it either lacks the signature of a representative of HED–France or if the signature is present, it is the signature of a party who cannot bind HED–France.

In support of its contentions, Cofacredit points to the following: (1) the document was labeled a draft, (2) a typed date on the document precedes the date of the incorporation of HED–USA although later corrected by a handwritten date coinciding with the date of incorporation of HED–USA, (3) some material in the document was enclosed in handwritten brackets, (4) addresses to which notices were to be directed were omitted, (5) Exhibit A (detailing all products HED–France manufactured) and Exhibit B (trademarks, trade names, and patents included in the agreement) were not annexed as stated in the document of agreement, (6) Brandli had not signed the document and, (7) even if he had, he was not empowered to bind HED–France. (Resp. at ¶¶ 12–13.)

The Defendants assert that a valid and binding consignment agreement existed between HED–USA and HED–France (Debtors' SOF at ¶¶ 19–25.) and that the merchandise was actually shipped to HED–USA on consignment as contemplated in the agreement. (Debtors' SOF at ¶ 25.) Nothing in the submission of either side indicates that the parties to the agreement ever questioned its validity.

■ The Plaintiff has not cited any law supporting the proposition that a stranger to a contract has standing to contest the validity of a contract unquestioned by the contracting parties, nor has this Court found any. We, therefore conclude that the contract is valid and the Plaintiff's "demand for payment" claim and its "account stated" claim probably will fail. The Plaintiff might have successfully argued that the contract was a part of a scheme to defraud and thus both a sham and a nullity, but it did not. Instead, Cofacredit seeks to defeat the contract on grounds normally raised by a party to a contract. Even if we were to assume, arguendo, that Cofacredit had standing to object to the validity of the contract, it still has not demonstrated its invalidity.

### a. IS THE "DRAFT" A CONTRACT?

■ Labels and extraneous markings on a contract are not controlling. Rather, the contents of the document and the intent of the parties determine whether, in fact, a

contract has been formed. *Teachers Ins. and Annuity Assoc. of America v. Tribune Co.,* 670 F.Supp. 491, 497 (Bankr.S.D.N.Y. 1987). *See also V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

■ In addition, it is well established that handwritten entries on a printed document take precedence over those in typeface. This proposition is based upon the belief that a handwritten entry expresses the latest intention of the parties to the contract. *Kratzenstein v. Western Assurance Co.,* 116 N.Y. 54, 22 N.E. 221, 222 (N.Y.1889). This is especially so when neither party to the contract contests the validity of the handwritten entries.

■ Furthermore, while a corporation is not bound by a contract entered into prior to its incorporation, the corporation will become bound if it ratifies by word or deed such a contract subsequent to its proper incorporation. *Reif v. Williams Sportswear, Inc.,* 9 N.Y.2d 387, 214 N.Y.S.2d 395, 174 N.E.2d 492 (1961).

■ Moreover, even if the agreement had merely been a draft, the parties may, by their later behavior, assent to the terms contained in the draft as a final expression of the terms in their contract. E. Allan Farnsworth, *Contracts,* 453 (1982). *See also* Restatement, Contracts § 209, Comment b.

■ The label "DRAFT" on the agreement clearly does not by itself serve to prevent its binding effect. The length and complexity of the document indicates that more than a proposal was intended. The brackets around four sentences in a fourteen page contract were undoubtedly intended to highlight a small number of potential problems, and thus are no more than extraneous markings.

■ The handwritten date of March 17 is clearly subsequent to the typed date of March 15, and is an indication of a later intent of the parties. For this reason, the

March 17 date should control. This date coincides with the incorporation of HED–USA. (Resp.Ex. 11—April 4, 1989 deposition of Lipszyc at 35.) Even if the agreement had been concluded prior to the incorporation of HED–USA, the actions of the corporation in receiving merchandise allegedly consigned and making payments to HED–France, supposedly against monetary quotas established in the agreement, served to ratify the agreement. (INF at ¶¶ 19, 20, 24.) We conclude, therefore, that what may have been merely a draft became an enforceable contract.

### b. THE CONTRACT WAS NOT VOID FOR INDEFINITENESS

■ A contract may be void for indefiniteness even though the parties to the contract believe they are bound. *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330, 1333 (Bankr.S.D.N.Y. 1982). For a contract not to be void for indefiniteness, the performances required of the parties must be reasonably certain. Such certainty can not be obtained unless the contract is definite with respect to essential terms.[5] *Hong Kong Export Credit Ins. Corp. v. Dun & Bradstreet,* 414 F.Supp. 153, 156–57 (Bankr.S.D.N.Y.1975). Essential terms are usually limited to price, quantity, and time. Restatement of Contracts § 33. Even when such essential terms are absent, however, the court may fill the gaps and supply the necessary terms. Indeed, the court in *American Cyanamid Co. v. Elizabeth Arden Sales Corp.,* 331 F.Supp. 597 (Bankr.S.D.N.Y.1971), did not hold a contract void for indefiniteness when a multimillion dollar contract for the sale of a "far flung business", negotiated by sophisticated parties, failed to include representations and warranties; left for further negotiation the disposition of interest earned on an escrowed purchase-money deposit; failed to establish accounting practices to determine the net worth of the company to be sold; and omitted a closing date. *Id.* at 604–05.

**5.** While the *Hong Kong* case refers to "material", we believe it meant "essential." A material term is any term properly bearing upon the subject matter of the contract. Essential terms are those items whose agreement is prerequisite to the formation of a contract. This distinction will be followed herein notwithstanding less precise language in some of the cases cited.

■ In the present case, the omitted items—Exhibits A and B, and the places to send notice—are clearly not essential to the creation of a contractual relationship, therefore, the contract is not void for indefiniteness. Although these items may be material, the court could easily have filled in the gaps. Exhibit A covers all products currently manufactured by HED–France or ever to be manufactured by it. Exhibit B covers all trademarks, trade names, and patents of HED–France. This information, while not set forth, is readily available. Furthermore, despite the absence of names and addresses of those to whom notice was to be sent, notice could properly have been directed to any corporate officer. Thus, the omitted particulars were not essential.

### c. WAS THE BRANDLI SIGNATURE ENFORCEABLE?

Cofacredit maintains that even if the agreement were a contract, Brandli did not sign it; further, that even if Brandli had signed it, his signature was a nullity since he had no authority under French law to sign such a document. Cofacredit, therefore asserts, that no binding contract was formed. We disagree.

■ Assuming that the agreement was not the mere formalization of a valid oral contract, then Brandli's signature, as an agent of HED–France, was required to form a contract and bind his principal. Restatement of Agency § 156. Brandli, an officer of HED–France (INF at ¶ 12.), signed the contract. (INF at ¶ 23.) It is possible that under French law not even an officer by himself could bind the company. In this case, however, the niceties of French jurisprudence are not at issue. The United States has a "paramount interest" in the outcome of this case. The contract was drafted and signed here. Moreover, the choice of laws clause in the contract (Debtor's Submission Ex. B at ¶ 13(f)) subjects the parties to the agreement to New York law and the jurisdiction of any federal or state court sitting in New York City. It was clearly the intent of the contracting parties

that the laws of this country should control the transaction. From this we may conclude that the parties to the agreement also intended U.S. law to govern the formation of the contract as well. United States law then, rather than foreign law, should govern the formation of this contract. *Hunter v. Greene,* 734 F.2d 896, 899–900 (2nd Cir. 1984).[6] The contract, therefore, is binding, since under the law of the forum, a principal or agent can obligate the company to a contract, and the chief executive of a corporation, whose primary business is the sales of products it manufactures, has apparent authority to enter into a contract for the sale of such product.

### 2. ESTIMATION OF CONTRACT CLAIMS—DEMAND FOR PAYMENT/ACCOUNT STATED

■ While this Court believes that there was a valid consignment contract and thus Cofacredit's "demand for payment" claim and its "account stated" claim will fail, we recognize that in at least some courts the issue may get to a trier of fact where there is at least some possibility of recovery. Under this set of facts, however, there is a small likelihood that there will a full recovery and a much larger likelihood that there will be none. We therefore value the portion of the claim based upon this theory as follows:

| Amount of Possible Award | Probability | Expected Value |
|---|---|---|
| $1,167,620 | .05 | $58,381 |
| 750,000 | 0 | 0 |
| 500,000 | 0 | 0 |
| 250,000 | 0 | 0 |
| 0 | .95 | 0 |

TOTAL EXPECTED VALUE $58,000

### C. *THE ESTOPPEL CLAIM*

Cofacredit alleges that HED–USA, Windsor Plumbing, and Windsor World concealed the existence of the consignment agreement between HED–USA and HED–France. (Resp. at ¶ 12.) The Plaintiff asserts that, due to the concealment of this fact, the doctrine of equitable estoppel now bars the Debtors from denying their liability to Cofacredit on invoices for goods shipped from

6. While the issue in the Hunter case was an interstate choice of laws problem, the approach and conclusions should apply as well to an international choice of laws problem.

HED–France to Windsor Plumbing. *Id.* at 34.

The doctrine of equitable estoppel should be applied cautiously and used only when grounds for its application are clearly established. *Thompson v. Simpson,* 128 N.Y. 270, 292, 28 N.E. 627 (1891). It is true, as the Plaintiff argues, that concealment of a material fact can give rise to equitable estoppel. *Stutelberg v. Farrell Lines, Inc.,* 529 F.Supp. 566, 569 (Bankr. S.D.N.Y.1982) *aff'd without opinion,* 697 F.2d 297 (2d Cir.1982); *Kurt H. Volk, Inc. v. Foundation for Christian Living,* 534 F.Supp. 1059, 1084–85 (Bankr.S.D.N.Y.1982); *In re Howard's Appliance,* 69 B.R. 1015, 1021 (Bankr.E.D.N.Y.1987), *aff'd in part and rev'd in part,* 91 B.R. 204 (Bankr.E.D.N.Y. 1988), *and rev'd,* 874 F.2d 88 (2d Cir.1989); *In re Ellison Associates,* 13 B.R. 661, 675 (Bankr.S.D.N.Y.1981), *aff'd,* 63 B.R. 756, 764 (Bankr.S.D.N.Y.1983); *BWA Corp. v. Alltrans Express U.S.A., Inc.,* 112 A.D.2d 850, 493 N.Y.S.2d 1, 3 (1985). However, the Plaintiff overlooks the fact that there must first be a duty to speak. *United States v. Georgia–Pacific Co.,* 421 F.2d 92, 97 (9th Cir.1970); *Blinn Wholesale Drug v. Eli Lilly & Co.,* 648 F.Supp. 1433, 1438–39 (Bankr. E.D.N.Y.1986) (construing Indiana common law); *Kurt H. Volk, Inc.,* 534 F.Supp. at 1084; *Howard's Appliance,* 69 B.R. at 1021; *In re Smith,* 51 B.R. 904, 912 (Bankr. M.D.Ga.1985); *In re Ellison Associates,* 13 B.R. at 675; *Thompson v. Simpson,* 128 N.Y. at 289, 291, 28 N.E. at 632–33; 57 N.Y.Jur.2d § 26.

A duty to speak has been found when there is a fiduciary or confidential relationship, superior knowledge in a transaction, or unjust enrichment. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150–51 (2d Cir.1993); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Assoc.,* 731 F.2d 112, 123 (2d Cir.1984); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 738–39 (2d Cir.1984); *Congress Financial Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 472 (Bankr.S.D.N.Y.1992); *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 773 (Bankr. S.D.N.Y.1985); *Kiamesha Development*

*Corp. v. Guild Properties, Inc.,* 4 A.D.2d 334, 164 N.Y.S.2d 958, 961–62 (1957); *rev'd on other grounds,* 4 N.Y.2d 378, 175 N.Y.S.2d 63, 151 N.E.2d 214 (1958). We will consider each of these prerequisites.

## 1. FIDUCIARY OR CONFIDENTIAL RELATIONSHIP

The New York common law approach to a fiduciary relationship has been explained as follows:

A fiduciary relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another. The term is a very broad one ... [R]elief is granted in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed.

*Fisher v. Bishop,* 108 N.Y. 25, 28, 15 N.E. 331 (1888); *United States v. Reed,* 601 F.Supp. 685, 707 (Bankr.S.D.N.Y.1985), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985); *Mobil Oil Corp. v. Rubenfeld,* 72 Misc.2d 392, 339 N.Y.S.2d 623 (1972), *aff'd,* 77 Misc.2d 962, 357 N.Y.S.2d 589 (1974), *rev'd on other grounds,* 48 A.D.2d 428, 370 N.Y.S.2d 943 (App.Div.1975), *aff'd,* 40 N.Y.2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976). However, the trust reposed must be justified. *Geis, P.C. v. Landau,* 117 Misc.2d 396, 458 N.Y.S.2d 1000 (1983); *Putnam Resources v. Frenkel & Co., Inc.,* 1992 WL 394386, *2 (Conn.Super.Ct.1992); *cf. Mendel v. Hewitt,* 161 A.D.2d 849, 555 N.Y.S.2d 899 (App.Div. 1990) (noting the Defendants' argument that reposal of confidence must be justified and indicating that the issue of whether or not the confidence was justified is a factual issue), *appeal after remand,* 185 A.D.2d 387, 585 N.Y.S.2d 832 (1992). Courts do not accept the argument that a relationship of trust is justified between parties to a business transaction. *Grumman Allied Industries,* 748 F.2d at 739; *Beneficial Commercial Corp.,* 601 F.Supp. at 772. Courts have explicitly rejected the proposition that a fiduciary relationship is created between a creditor and a third party merely by reason of a contract between that third party and the creditor's debtor. *Beneficial Commercial Corp.,* 601 F.Supp. at 772; *Du Pont v. Perot,* 59 F.R.D. 404, 409 (Bankr.S.D.N.Y.1973).

The Debtors and Cofacredit were never in privity, nor did they negotiate any business transactions. There was no business relationship between the two parties, much less a relationship of trust. The relationship alleged by the Plaintiff was one of a creditor—third party, a relationship which by itself cannot give rise to a fiduciary duty. Therefore, any reliance on the part of Cofacredit was not justified.

A confidential relationship arises when one party places confidence in the other with a resulting superiority and influence on the other side. *Francois v. Francois,* 599 F.2d 1286, 1292 (3d Cir.1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980). New York fiduciary law embraces not only the traditional trustee and beneficiary relationship, but also more informal relationships, where it is clearly evident that one party reasonably trusted another. *Brass,* 987 F.2d at 150–51. Examples include priest/parishioner, bank/depositor, majority/minority shareholders, subsidiary executives/parental corporate entity, close friends, and family members. *Id.*

Although the focus of the inquiry is shifting away from the parties' formal legal relationship to their reasonable expectations, the rule of *caveat emptor* remains valid in New York. *Brass,* 987 F.2d at 150; *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 819 F.Supp. 1282, 1292 (Bankr.S.D.N.Y.1993), *later proceeding,* 850 F.Supp. 1199 (Bankr.S.D.N.Y.1994); *Brown v. Stinson,* 821 F.Supp. 910, 914–15 (Bankr.S.D.N.Y.1993). In order for the expectations to be reasonable, the relationship must first develop a high degree of trust between the parties from which a duty may arise. *Brown,* at 914–15. "Frequently, it is said that their relationship must inspire the disclosure, and that the relationship cannot merely emerge from the revelation's wake." *Reed,* 601 F.Supp. at 715; *see also Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 767 F.Supp. 1220, 1231–32 (Bankr. S.D.N.Y.1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992). Unilateral investment of confidence by one party is insufficient to encumber the other with the obligations and duties of a confidential relationship. *Litton Industries, Inc.,* 767 F.Supp. at 1232; *Reed,* 601 F.Supp. at 715. Courts must look to the facts and circumstances in each case to determine if the confidence reposed is justified. *Reed,* 601 F.Supp. at 715. Prior business dealings may create confidential relationships, but arm's length commercial discussions between two business entities do not do so. *National Westminster Bank, USA v. Ross,* 130 B.R. 656, 679 (Bankr. S.D.N.Y.1991), *aff'd without opinion, Yaeger v. National Westminster Bank, USA,* 962 F.2d 1 (2d Cir.1992); *Beneficial Commercial Corp.,* 601 F.Supp. at 772; *Citytrust v. Atlas Capital Corp.,* 173 A.D.2d 300, 570 N.Y.S.2d 275 (App.Div.1991).

We are unable to find any cases in New York or other jurisdictions that justify such reliance and trust in a relationship as tenuous as Cofacredit's with the Debtors. The Debtors did not have prior business dealings with Cofacredit. Cofacredit negotiated its contract with HED–France without any contact with the Debtors. Later, the Debtors had, at most, a few meetings to discuss the agreement between HED–France and Cofacredit. One meeting was conducted in French. The limited correspondence between the firms was solely concerned with unpaid invoices. This does not create a relationship of trust. Cofacredit placed its trust in its customer, not its customer's customer.

## 2. SUPERIOR KNOWLEDGE

Under New York law, a duty to speak arises *in a business transaction* where one party possesses superior knowledge not readily available to the other and knows that the other is acting on the basis of mistaken knowledge. *Aaron Ferer & Sons, Ltd.,* 731 F.2d at 123. Estoppel by concealing superior knowledge often occurs in cases involving sales transactions where a seller has adverse knowledge about a product that he fails to disclose to the buyer. *See, e.g., Donovan v. Aeolian Co.,* 270 N.Y. 267, 271, 200 N.E. 815, 104 A.L.R. 546 (NY.1936).

There is an increasing tendency in New York courts to apply the rule of "superior knowledge" in contexts which at one time would have been subject to criticism. *Chiar-*

*ella v. United States,* 445 U.S. 222, 247–48, 100 S.Ct. 1108, 1124, 63 L.Ed.2d 348 (1980) (Blackmun, J., dissenting); *Congress Financial Corp.,* 790 F.Supp. at 472; *Beneficial Commercial Corp.,* 601 F.Supp. at 773; *Minpeco,* S.A. at 337; *Gaines Service Leasing Corp. v. Carmel Plastic Corp.,* 105 Misc.2d 694, 432 N.Y.S.2d 760, 763 (Civ.Ct. Kings Co.1980), *aff'd,* 113 Misc.2d 752, 453 N.Y.S.2d 391 (App.Div.1981). Consistent with other jurisdictions, New York now limits the ability to take advantage of ignorance. *Brass,* 987 F.2d at 151–52; *Banque Arabe,* 819 F.Supp. at 1292. This, of course, broadens the duty to speak, but even in those cases where the duty has been enlarged, courts have not extended such a duty to one who is not a party to the transaction. *Chiarella,* 445 U.S. at 247–48, 100 S.Ct. at 1124 (Blackmun, J., dissenting); *Congress Financial Corp.,* 790 F.Supp. at 472; *Beneficial Commercial Corp.,* 601 F.Supp. at 773; *Minpeco,* S.A. at 337; *Gaines Service Leasing Corp.,* 432 N.Y.S.2d at 763. Moreover, the Plaintiff has not alleged that it relied on any inaction or conduct of the Debtors before entering into the financing agreement with HED–France.

Again, Cofacredit transacted no business with the Debtors. These parties had no contractual relationship, nor were they negotiating one. Cofacredit's business relationship and contract were with HED–France. New York courts have not found a duty to speak on the part of third parties to such a transaction even where superior knowledge existed.

### 3. UNJUST ENRICHMENT

 Estoppel often arises in real estate disputes, where a plaintiff knowingly permits a defendant to mistakenly spend a large sum of money to improve a plaintiff's land. *Georgia Pacific Co.,* 421 F.2d at 97; *In re Ellison Associates,* 13 B.R. at 676; *Thompson,* 128 N.Y. at 291, 28 N.E. at 633; *Kiamesha Development Corp.,* 164 N.Y.S.2d at 961–62. New York courts have held that "the duty to speak is not necessarily a legal obligation to do so but it is founded upon a sense of justice and fair play invoked by the courts to compel a man to act when in all good conscience an honest man would have

acted." *Columbia Broadcasting System, Inc. v. Stokely–Van Camp, Inc.,* 522 F.2d 369, 378 (2d Cir.1975); *Podolsky v. Narnoc Corp.,* 149 Misc.2d 839, 572 N.Y.S.2d 618, 620 (1991), *rev'd on other grounds, application granted,* 196 A.D.2d 593, 601 N.Y.S.2d 320 (App.Div.1993); *Ryder Truck Rental, Inc. v. Williamstown Wire & Cable Co.,* 62 Misc.2d 848, 309 N.Y.S.2d 508, 510 (1970); *Simmons v. Westwood Apartments Co.,* 46 Misc.2d 1093, 261 N.Y.S.2d 736, 740 (1965), *aff'd,* 26 A.D.2d 764, 271 N.Y.S.2d 731 (App.Div.1966). However, this Court can find no application of this doctrine absent privity between the parties or an unjust enrichment. Moreover, the doctrine is applied to restore to a plaintiff, the benefit wrongfully obtained. Here the Debtors obtained no benefit. *See infra* Part IV.E.3.b.

The Plaintiff's reliance on *In re Ellison Associates* is misplaced. *Ellison* specifically states, in the sentence after the one cited in the Plaintiff's Response, that a relationship must exist between the parties for equitable estoppel to apply. *In re Ellison Associates,* 63 B.R. at 765. In *Ellison,* there was a relationship between a mortgagor and mortgagee of real estate. *Id.* at 758. Cofacredit and the Debtors were not involved in a real estate transaction, nor any transaction. The Plaintiff also erroneously relies on *Ryder Truck Rental, Inc.,* 309 N.Y.S.2d at 509 (where there was a relationship between a lessor and lessee) and *Simmons,* 261 N.Y.S.2d at 738–39 (where there was privity of estate between the parties). Again, there simply was no relationship between Cofacredit and the Debtors. Cofacredit's agreement was with HED–France, an entity entirely unrelated to the Debtors.

Nor does the Debtors' silence offend our sense of justice, as they were not enriched by this transaction in the real estate cases cited above. The goods in dispute were not readily marketable in the American market. (Resp.Ex. 11, Lipszyc Dep. at 60; INF at ¶ 20.) They were only prototypes for examination, so that style and technology recommendations could be to HED–France with the expectation that a changed product could be mass-marketed in the United States. It is not implausible for the Debtors to expect

that they would not have to pay for such goods.

This Court will not impose a duty to speak where none has been imposed before. Absent a duty to speak, this Court will not invoke the doctrine of estoppel against the Debtors. While it is true that a party should not base a claim on its own inequity, *Imperator Realty Co. v. Tull*, 228 N.Y. 447, 127 N.E. 263, 266 (1920), we do not believe the Debtors engaged in inequitable conduct. The Debtors can deny liability for invoices representing goods shipped from HED–France to the Debtors on consignment.

## D. ESTIMATE OF THE ESTOPPEL CLAIM

■ While we conclude that Cofacredit's estoppel claim has no merit, we recognize that reasonable courts may differ and we acknowledge a one in five chance that this portion of the claim may get to a trier of fact and a one in four chance that the claim might succeed there. Again, since the magnitude of Claimant's loss is not in issue and there is no rational basis for allowing other than all or nothing under this theory, we value this portion of the claim at one twentieth of the total loss of $1,167,620 and estimate its value at $58,381.

## E. *THE FRAUD CLAIM*

In its Amended Complaint, Cofacredit states as its second claim, that the Debtors made false representations to the Plaintiff. (Am.Compl. at ¶ 23.) The Plaintiff contends that the Debtors knew the representations were false when made. *Id.* at ¶ 24. The Plaintiff specifically alleges five representations that it claims the Debtors made. These are that:

1. The Debtors withheld from the Plaintiff, the fact that the goods covered in the HED–France invoices were sold not directly to Windsor Plumbing but to HED–USA, an entity whose existence the Plaintiff maintains the Debtors concealed from them. (Am. Compl. at ¶ 25.)

2. The Debtors concealed from the Plaintiff, that the invoices it ultimately factored were not in some sense "genuine", since they misrepresented the true parties to the transaction. (Am.Compl. at ¶ 26.)

3. The Debtors concealed from the Plaintiff, the fact that the consignment agreement, whereby HED–USA would market the merchandise of HED–France in the United States, required HED–France to make sales in excess of existing export insurance coverage. (Am.Compl. at ¶ 28.)

4. The Debtors delivered to the Plaintiff, financial statements of Windsor Plumbing and "[f]alsely represented them as evidence of the creditworthiness of the purchaser . . . ." (Am.Compl. at ¶¶ 17, 27.)

5. The Debtors represented to the Plaintiff, that it would open letters of credit to pay for invoices when, in fact, the Debtors never intended to open such letters of credit. (Am. Compl. at ¶ 29.)

In addition, the Plaintiff alleges that it relied on the representations of the Debtors, although it does not claim such reliance was reasonable. The Plaintiff further alleges that its reliance caused it injury by allowing the Debtors to factor $1,167,620 worth of invoices which would not have been factored absent such representation. (Am.Compl. at ¶ 30.)

■ Cofacredit's claim is evidently for fraud. It is well-settled that a cause of action sounding in common law fraud must plead and prove by clear and convincing evidence each of the five following elements:

1. Misrepresentation of an existing material fact,

2. The Defendant knew his statement was false, or he made it with reckless indifference to its truth,

3. Intent to deceive, i.e. scienter,

4. The Plaintiff's justifiable reliance on the misrepresentation, and

5. Damages proximately caused by the reliance.

*Young v. Keith,* 112 A.D.2d 625, 492 N.Y.S.2d 489, 490 (1985) (listing the five elements); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 835 (1958); *Calspan Corp. v. Fingermatrix, Inc.,* 104 A.D.2d 1016, 480 N.Y.S.2d 942, 943 (App.Div.1984) (explaining

that the Plaintiff's reliance on a misrepresentation must have been justified); *Kuelling v. Roderick Lean Mfg. Co.*, 183 N.Y. 78, 75 N.E. 1098, 1100 (1905) (stating that an action for fraud will fail if any of the five elements is not proved); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966 (2d Cir.1987) (enunciating the New York standard of proof in cases of common law fraud as clear and convincing); *See also In re Steven Hanna*, 163 B.R. 918, 925 (Bankr.E.D.N.Y.); *Peerless Ins. Co. v. Nedelka*, 155 B.R. 813, 816 (Bankr.D.Conn.1993).

## 1. MISREPRESENTATION OF AN EXISTING FACT

### a. Concealment

 The Plaintiff fails to indicate its ability to prove by clear and convincing evidence that the Debtors made a misrepresentation in any of the first three allegations. For this reason, those allegations will not support a claim for fraud. The first element of fraud is the misrepresentation of an existing fact made by the Defendants. The Plaintiff in allegations 1–3 does not assert that the Debtors made a misrepresentation but merely that they concealed the existence of certain information by their silence. An active concealment is substantively the same as an affirmative misrepresentation. 60 N.Y.Jur. 2d, Fraud and Deceit § 88. Active concealment, however, implies purposeful misrepresentation, i.e., the Defendant's affirmative attempt to hide something. *London v. Courduff*, 141 A.D.2d 803, 529 N.Y.S.2d 874, 875 (App.Div.1988). Mere silence is not active concealment, 60 N.Y.Jur.2d, Fraud and Deceit § 89, and the Plaintiff does not claim more than silence on the part of the Debtors.

 Assuming that the Plaintiff meant passive nondisclosure rather than active concealment, it should be noted that liability for nondisclosure is narrower than for active concealment. *United States v. Dial*, 757 F.2d 163, 168 (7th Cir.1985), *cert. denied*, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985). Mere nondisclosure is not actionable unless there is a duty to speak. *Brass*, 987 F.2d at 150–51. We have already concluded that with regard to the Plaintiff's estoppel claim the Debtors had no duty to speak; for the same reasons they have none here. Having no duty to speak and not having spoken, there was neither active nor passive concealment and, hence, no liability. The Debtors made no misrepresentation of an existing fact, and thus, the Plaintiff cannot prevail on a fraud claim based upon these allegations.

### b. Presenting Financial Statements

 In its fourth allegation, the Plaintiff claims that it relied to its detriment on financial statements supplied to it by the Debtors, and that the Debtors, as purchasers of goods from HED–France, represented these statements as evidence of their creditworthiness. However, these financial statements did not constitute a knowing misrepresentation intended to deceive.

French Embassy officials obtained financial statements from Windsor Plumbing for purposes essentially left unexplained to the Debtors. (May 18, 1989 Deposition of Sholam Weiss at 28–30; INF at ¶¶ 17, 18.) These officials apparently turned the statements over to Cofacredit. Thus, it appears that Windsor Plumbing's financial statements surfaced in the hands of an unintended third party.

 The law in this jurisdiction with regard to third-party reliance for misrepresentations by a defendant is clear. A plaintiff to whom the representations are not made directly may not recover for fraud unless the defendant intended or expected the misrepresentation to reach that particular plaintiff, or a class of persons including the plaintiff. *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444 (1931), *not followed by, Credit Alliance Corp. v. Arthur Anderson & Co.*, 101 A.D.2d 231, 476 N.Y.S.2d 539 (App.Div.1984), *rev'd, certified question answered, Credit Alliance Corp. v. Arthur Anderson & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985); *Kuelling*, 75 N.E. at 1100. The measure of liability is intention or expectation, and thus something stronger than mere foreseeability. *See Rosen v. Spanierman*, 894 F.2d 28 (2d Cir. 1990) (stating that a buyer of a painting cannot maintain an action for fraud absent

evidence that the seller intended or expected representations that the seller made to donees to be repeated to buyer); *Chase Manhattan Bank, N.A. v. Fidata Corp.,* 700 F.Supp. 1252 (Bankr.S.D.N.Y.1988) (explaining that a misrepresentation can support a claim for fraud by a third party if the maker of the misrepresentation intended or had reason to expect the misrepresentation would be repeated to that third party). Since the Defendants did not appear to have intended that Cofacredit receive the financial statements, they are not liable to Cofacredit for having made an actionable misrepresentation.

### 2. INTENT TO DEFRAUD

#### a. The First Four Allegations

■ Even if the first four allegations were in fact misrepresentations of an existing fact, the Plaintiff would still have to allege and prove an intent to defraud to sustain its fraud claim, and it does not. The Plaintiff offers no direct evidence whatsoever that the Defendants had an intent to defraud. However, direct evidence is not necessarily required, since courts will often infer such intent from the totality of the pertinent circumstances. *In re Hutchinson,* 27 B.R. 247, 251 (Bankr.E.D.N.Y.1983); *In re Newmark,* 20 B.R. 842, 858 (Bankr.E.D.N.Y.1982); *In re Lacey,* 85 B.R. 908, 910 (Bankr.S.D.Fla.1988). In fact, intent to defraud is often established from circumstantial evidence and the inferences that may be deduced from such evidence. *Goshen Litho, Inc. v. Kohls,* 582 F.Supp. 1561, 1564 (Bankr.S.D.N.Y.1983).

■ In this case, the Plaintiff does not even claim the existence of circumstantial evidence from which the Court might conclude that an intent to defraud existed. A motive for undertaking a fraud can act as a surrogate for intent, but the only motive the Plaintiff alleged, inflating the value of the Windsor World inventory, is factually unsustainable. *See infra* Part IV.E.3.b. Thus, the fraud claim, based upon allegations 1–4 would fail, because the Plaintiff does not offer proof of an intent to defraud.

#### b. Promise to Issue Letters of Credit

In the fifth allegation, the Plaintiff claims that the Defendants had an intent to defraud when they promised to open letters of credit to pay certain invoices. In a facsimile sent August 12, 1988, from Lipszyc to Cofacredit, the Debtors promised to open letters of credit to "... pay for the balance of the invoices due until the end of the year." (Resp.Ex. 14; Pl.['s] SOF at ¶ 78; INF at ¶ 30.) Jarry, in a facsimile to Lipszyc dated August 17, 1988, confirmed receipt of this message, saying "Cofacredit agrees with L.C." (Resp.Ex. 15; Pl.['s] SOF at ¶ 79.) The Plaintiff further alleges that the Debtors "... never did furnish letters of credit ..." (Pl.['s] SOF at ¶ 82.) The Debtors never denied these allegations. Following this exchange and between August 26, 1988 and September 23, 1988, the Plaintiff, in alleged reliance upon the promise to open letters of credit, accepted assignment of fifteen more invoices under its Factoring Agreement with HED–France.

■ The Plaintiff claims that the Debtors never intended to open the letters of credit. However, Cofacredit has proffered nothing to substantiate this contention and relies only upon the bare fact that no letters of credit were ever opened. As the court noted in *Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186, 195 (1980), "Fraudulent intent not to perform a promise cannot be inferred merely from the fact of non-performance." In order to establish scienter, a plaintiff must establish that the defendant had no intention of keeping his promise at the time the promise was made. *Id.* at 194. Therefore, an offer of proof in addition to the non-performance is required to sustain a claim for fraud. *Id.* at 195; *Songbird Jet, Ltd. v. Amax, Inc.,* 581 F.Supp. 912, 925 (Bankr.S.D.N.Y.1984), *supplemental opinion,* 605 F.Supp. 1097 (Bankr.S.D.N.Y.1985), *aff'd without opinion,* 779 F.2d 39 (2d Cir.1985), *aff'd without opinion,* 812 F.2d 713 (2d Cir. 1987). Having offered to produce no additional proof to show that the Debtors lacked the intention to honor their promise when made, the Plaintiff's allegation five would not support a finding of fraud.

### 3. RELIANCE

Even had the Plaintiff indicated that it could prove the first three elements of fraud by clear and convincing evidence, it would still have had to show not only that it had relied on the misrepresentation of the Debtors, but also that such reliance was reasonable. *In re Tesmetges,* 74 B.R. 911, 916 (Bankr.E.D.N.Y.1987), *aff'd,* 86 B.R. 21 (Bankr.E.D.N.Y.1988), *aff'd,* 862 F.2d 304 (2d Cir.1988). A creditor may show actual reliance by demonstrating that the creditor extended credit only in response to the representation. *In re Mitchell,* 70 B.R. 524, 527 (Bankr.N.D.Ill.1987). A court may measure the reasonableness of a creditor's reliance upon a false representation by employing an objective standard to determine the degree to which it exercised ordinary care. *Tesmetges,* 74 B.R. at 916. The degree to which a creditor follows its own policies and procedures in more than a perfunctory manner is one such objective standard. *Mitchell,* 70 B.R. at 527; *In re Jacox,* 115 B.R. 218, 221 (Bankr.D.Neb.1988).

#### a. The First Four Allegations

Cofacredit did not reasonably rely on the alleged misrepresentations claimed in the first four allegations. The Plaintiff had seemingly sophisticated procedures to insure that it would not be defrauded when factoring invoices. In its standard agreement with customers, Cofacredit arrogated to itself the right to contact the buyer and verify the accuracy of the account. (Resp. Ex. 6 at ¶ 4.) Furthermore, Cofacredit had a complicated procedure to alert buyers that the invoices of their supplier were being factored. Jarry apparently explained these procedures in great detail to the employees of HED–France. (Resp. Ex. 7, at ¶¶ 5–6.)

Cofacredit simply did not follow its own procedures, and thus, even if the Defendants had made misrepresentations with the requisite intent, the Plaintiff cannot now be heard to say that its reliance was reasonable. Cofacredit did not follow its own procedures as far as account verification is concerned. It sent the Defendants a first account verification on April 15, 1988. (Resp. Ex. 8; Pl.['s] SOF at ¶ 69.) That document instructed the recipient to "... kindly send the letter back to us with your signature in agreement ..." The Debtors never did this, and the Plaintiff makes no claim of having received such a letter. (INF at ¶ 25) Yet, Cofacredit continued to factor invoices for approximately five more months. In July, Cofacredit apparently attempted another account verification. (Pl.['s] SOF at ¶ 70.) Again, Cofacredit continued to factor invoices into September without any written confirmation that the account debtor actually owed the amounts claimed. This lack of verification should have raised a red flag. Exercise of ordinary care by a sophisticated lender would require that it cease factoring invoices until the situation clarifies itself.

Finally, even if the Defendants had made a misrepresentation of existing fact by issuing the financial statements, it cannot be said that Cofacredit reasonably relied on such misrepresentation when entering into the Factoring Agreement with HED–France. Cofacredit offers nothing to indicate that any of its employees evaluated the financial statements before it made the decision to extend credit. (INF at ¶ 18) Absent such indication, it is impossible to conclude reasonable reliance.

### 4. ESTIMATE

Each and every element of common law fraud must be proved by clear and convincing evidence. In the present case, the Plaintiff has not offered to prove: (1) misrepresentation of an existing fact, (2) scienter, and (3) reasonable reliance. Thus, this claim for relief should fail. However, here again we recognize that perhaps one court in ten might permit this cause of action to go to a finder of fact, and once having gotten there, we believe that the range of possible recoveries would probably be as follows:

| Amount of Possible Award | Probability | Expected Value |
|---|---|---|
| $1,167,620 | 0 | $ 0 |
| 750,000 | .05 | 40,875 |
| 500,000 | .10 | 50,000 |
| 250,000 | .30 | 75,000 |
| 0 | .55 | 0 |

TOTAL EXPECTED VALUE $165,875

Allowing as we did above only a one out of ten chance that the sum calculated above

might be awarded on this cause of action, we value the claim therefore at the sum of $16,-587.50.

## F. *THE RICO CLAIMS*

### 1. THE PLAINTIFF'S ALLEGATIONS

Cofacredit alleges that the Defendants with others violated 18 U.S.C. 1962(c) by conducting the affairs of an enterprise, an association in fact, through a pattern of racketeering activity. (Am.Compl. at ¶ 16.) More specifically, Cofacredit alleges that the Defendants engaged in a pattern of racketeering activity that included violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud). These acts, among others, constitute predicate RICO acts. The Plaintiff further claims that such racketeering activity commenced at least as early as April 1988 and continued through the time the Amended Complaint was filed in January of 1989. (Am.Compl. at ¶ 16.) In addition, the Plaintiff claims that the Defendants and others conspired to commit predicate RICO acts and thus violated 18 U.S.C. § 1962(d). *Id.* A more nuanced, although not necessarily more enlightening, RICO claim is included in the Plaintiff's post-pleading submission. (Resp. at ¶¶ 47–52.)

### 2. THE LAW

RICO in pertinent part makes it unlawful:

... for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...

18 U.S.C. § 1962(c). In addition, the statute also makes it unlawful:

... for any person to conspire to violate any of the provisions of section (a), (b), or (c) of this section.

18 U.S.C. § 1962(d).

The terms "racketeering activity", "person", "enterprise", and "pattern of racketeering activity" are defined in pertinent part as follows:

(1) "racketeering activity" means ...

B) any act which is indictable under any of the following provisions of Title 18 United States Code ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ...

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association or other legal entity, and any union or individuals associated in fact although not a legal entity;

(5) "Pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity; ...

*Id.* §§ 1961(1)(3)(4)(5).

Any private party injured in his business or property as a result of any RICO predicate acts may sue and recover threefold damages and reasonable attorney's fees. *Id.* § 1964(c).

Courts have further defined the concepts of "enterprise" and "pattern of racketeering" in the RICO context. In *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court stated that: "The enterprise is an entity, for present purposes[,] a group of persons associated together for a common purpose of engaging in a course of conduct ... [an enterprise] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 581–85, 101 S.Ct. at 2528–29. Thus, for an enterprise to constitute a "group of individuals associated in fact," it must exhibit a "community of interest" and have a "continuing core of personnel." *United States v. Errico*, 635 F.2d 152, 156 (2d Cir.1980); *See also United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir.1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992). Even though proof of various racketeering acts may possibly be used to establish the exis-

tence of an enterprise, the enterprise as defined in *Turkette* and *Errico* must still be alleged and proved. *United States v. Coonan*, 938 F.2d 1553, 1559–60 (2d Cir.1991). It is important to remember that: "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529.

The Supreme Court amplified the meaning of the "pattern of racketeering activity" when it held that:

> RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity.

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original).

 A number of means are available by which the inter-relationship between acts may establish the existence of a pattern. Some such means are proof of the temporal proximity of the acts, their common goals, or a similarity in method among the acts. Of course, the degree of proximity, similarity in methods or goals, and repetitions directly determines the extent to which the acts establish a pattern. *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). The Supreme Court has further defined the meaning of continuity as it relates to the conduct of criminal activity within a "pattern of racketeering." It held that:

> Continuity is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition (citations omitted).... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates over a substantial period of time. Predicate acts extending over a few weeks or months and threatening future criminal conduct do not satisfy this requirement ...

*H.J. Inc.*, 492 U.S. at 241–43, 109 S.Ct. at 2902. *See Qantel Corp. v. Niemuller*, 771 F.Supp. 1361, 1370–71 (Bankr.S.D.N.Y.1991) (stating that predicate acts taking place within at most a few months of each other are not sufficient to establish continuity); *Azurite Corp. v. Amster & Co.*, 730 F.Supp. 571, 581 (Bankr.S.D.N.Y.1990) (maintaining that a series of predicate acts occurring over seven months do not constitute continuity for purposes of a pattern of racketeering activity). *But see Polycast Technology Corp. v. Uniroyal Inc.*, 728 F.Supp. 926, 947–48 (Bankr. S.D.N.Y.1989) (declaring that predicate acts occurring within eight and one-half months sufficient to establish continuity). A pattern, then, is not continuous over a closed period if it takes place during fewer than eight months.

The courts have also dealt with the issue of the threat of future criminal conduct as a component of continuity within the meaning of a "pattern of racketeering activity." The Second Circuit has held that an act performed in the furtherance of a racketeering enterprise "... automatically carries with it the threat of continued racketeering activity." *Indelicato*, 865 F.2d at 1383–84. The same court went on to say, however, that:

> When ... there is no indication that the enterprise whose affairs are said to be conducted through racketeering acts is associated with organized crime, the nature of the enterprise does not of itself suggest that racketeering acts will continue, and proof of continuity of racketeering activity must thus be found in some factor other than the enterprise itself.

*Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.1989) (en banc), *vacated, remanded,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *original decision adhered to,* 893 F.2d 1433 (2d Cir.), *cert. denied,* 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). Thus, unless organized criminal elements are involved, proof of the enterprise must be adduced separately from proof of the alleged racketeering activity to prove the open-ended continuity suggested by a "threat of continued criminal activity."

In addition to the "enterprise" and the "pattern", the plaintiff in a civil RICO action must also allege and prove the predicate acts by a preponderance of the evidence. *Cullen v. Margiotta*, 811 F.2d 698, 731 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir. 1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). The predicate acts in these cases are violations of the federal mail and wire fraud statutes.[7] To show such violations, the Plaintiff must establish that the Defendants engaged in a scheme to defraud, with the specific intent to defraud (scienter), and used either the United States mail or interstate wires or both in furtherance of the scheme. *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 790 (1st Cir.1990), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *See also United States v. Von Barta*, 635 F.2d 999, 1005 n. 14 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

Scienter is often difficult to prove directly but it may be established by circumstantial evidence. *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir.1984). Some courts have held that:

> [a] common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater....

*Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (citations omitted). *See also United States v. Green*, 745 F.2d 1205, 1207 (9th Cir.1985) (stating that the plaintiff satisfies the requirement of proof of specific intent if "... it proves the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself.").

However, the requirement of demonstrating scienter is not met if a motive is alleged which makes no economic sense. *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates*, 777 F.Supp. 228, 238–39. (Bankr.S.D.N.Y.1991)

Pursuant to 18 U.S.C. § 1962(d), it is also actionable for an individual to conspire to violate the RICO statute. Agreement to commit the predicate acts that violate the RICO statute is the essence of § 1962(d). Section 1964(c) creates a civil cause of action for any violation of § 1962 provided that some injury has occurred. However, since an agreement by itself cannot cause an injury, Congress presumably intended that defendants must have completed some predicate acts to be liable under the statute.[8] Without completion of such acts in furtherance, it would not be possible for an injury to have occurred. *Medallion TV Enters. v. SelectTV of California, Inc.*, 627 F.Supp. 1290, 1297–98 (C.D.Cal.1986), *aff'd*, 833 F.2d 1360 (9th Cir.1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). In New York at common law, a civil conspiracy claim must also be founded on an injury resulting from an unlawful overt act. *See infra*, Section G. Thus, a plaintiff seeking treble damages for a RICO conspiracy must plead and prove by a preponderance of the evidence that: 1) the defendant personally agreed to violate at least two predicate acts 2) the defendant willfully became a member of such conspiracy 3) plaintiff suffered an injury and 4) defendant proximately caused that injury. *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied sub nom, Rabito v. United States*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984);

---

7. Since the relevant language in the mail and wire fraud statutes is essentially the same, it is appropriate to apply the same analysis to the allegations under both statutes. *Carpenter v. United States*, 484 U.S. 19, 20–26, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987).

8. Surprisingly, less proof is required to sustain a charge of criminal RICO conspiracy than for a claim of civil RICO conspiracy. The government does not have to prove any act in furtherance to prevail in a criminal RICO conspiracy case. *United States v. Teitler*, 802 F.2d 606, 613 (2d Cir.1986).

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–25 (2d Cir.1990); *United States v. Carter*, 721 F.2d 1514, 1528–29 (11th Cir.1984).

■ Finally, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity ..." Fed.R.Civ.P. 9(b). The Second Circuit has interpreted this to mean that charges of fraud involving federal statutes must specifically identify the time, place, originator, and content of any alleged misrepresentation. In addition, misrepresentation may not be alleged generally against a group of defendants. The Plaintiff must specify the role that each defendant played in the scheme to defraud. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *See also McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *Dileo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) ("... 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."); *Bennett v. Genoa AG Center, Inc.*, 142 B.R. 616, 622 (Bankr.N.D.N.Y.1992).

■ While fraud usually must be pleaded with particularity, it may be pleaded upon information and belief when the information necessary to complete the plaintiff's complaint lies almost exclusively within the control of the opposing party. *DiVittorio*, 822 F.2d at 1248. Nevertheless, the plaintiff continues to carry the burden of alleging the facts on which his beliefs are based. *Id.* Furthermore, when considering a motion to dismiss, the plaintiff's allegations of fact are assumed true. *Luce v. Edelstein*, 802 F.2d 49, 52 (2d Cir.1986).

### 3. APPLICATION OF THE RICO STATUTE TO COFACREDIT'S CLAIMS

#### a. Particularity of Pleading

■ Cofacredit's RICO claim as stated in the Amended Complaint would be subject to a motion to dismiss for failure to plead mail and wire fraud with particularity. To the extent that this Court can decipher Cofacredit's pleadings, all the RICO pleadings are made only on "information and belief." (Am. Compl. at ¶¶ 15–21.) Such pleading would still be insufficient even if one could assume that Cofacredit was not in a position to know the relevant facts concerning the scheme to defraud, since virtually no facts at all were alleged to support its beliefs. Moreover, Cofacredit did not specify the precise role that each of the Defendants played in the alleged scheme to defraud.

It is clear, however, that Cofacredit has knowledge of invoice dates, dates when misrepresentations as to the genuineness of HED–France invoices were made and by whom, who concealed the existence of the Distribution Agreement, who delivered the financial statements, and who allegedly authorized the issuance of the letters of credit. (Pl.['s] Resp. at ¶¶ 56–83.) Thus, a better-crafted, second amended complaint, if permitted, could conceivably overcome the infirmities of the first two.

#### b. Mail and Wire Fraud

■ Even if Cofacredit's RICO claim were not dismissed for failure to plead fraud with particularity, it would still fail, because the Plaintiff's submission was devoid of any indication of the scienter that it alleged in the Amended Complaint and that it is required to prove in order to sustain a claim for mail and wire fraud. Recognizing that motive is probative of scienter, to meet its burden of proof on this issue, the Plaintiff alleged that the Debtors concocted a complex scheme to defraud. According to Cofacredit, the motive that drove the scheme was the desire to increase the capital base of Windsor World.

The Plaintiff asserts that the Defendants accomplished this goal by adding to the inventory of Windsor World the value of the so-called "consigned merchandise" of HED–USA, thereby artificially inflating its capital base. The Plaintiff contends that this enhanced the ability of Windsor World to sell its securities to the public. (Am.Compl. at ¶¶ 15, 18.) Such a scheme on the part of Windsor World is unsubstantiated. As we have already discussed (INF at ¶ 31.), the Debtors have submitted documents tending to negate this allegation while the Claimant

has offered nothing to bolster its theory. The conclusion of scienter therefore falls with the negation of the premise of inventory manipulation.

### c. The RICO Enterprise

 Assuming, *arguendo,* that the Plaintiff were able to establish the predicate acts of mail and wire fraud, its RICO claim would still fail, because there is no indication that it can establish the existence of an enterprise. Cofacredit claims, but offered nothing to substantiate, that the Defendants constituted an "enterprise" within the meaning of the RICO statute. A "group of individuals in fact" may be an "enterprise", but to be so designated it must exhibit a community of interest. Cofacredit proffered nothing to indicate that such a community of interest ever existed. For this reason alone, it is not likely to prevail on its RICO cause of action.

What appears to have existed, is two groups with quite different interests. The French defendants apparently made off with Cofacredit's money. The Plaintiff never claimed that the American group, including Windsor Plumbing, ever received or in any way benefitted from these funds. Furthermore, the Plaintiff has not proffered anything whatsoever to suggest that the American Defendants had any interest in the purported scheme.

Even if Cofacredit had linked the French Defendants and Debtors through a "community of interest", no RICO enterprise could be established unless the Plaintiff alleged and proved a continuing core of personnel. Cofacredit neither claimed a continuing core of personnel nor offered anything to substantiate its existence.

### d. The Pattern of Racketeering Activity

 For a "pattern of racketeering activity" to exist, the racketeering predicate acts must "amount to or pose a threat of continued criminal activity". *H.J. v. Northwestern Bell,* 492 U.S. at 237–39, 109 S.Ct. at 2900. Cofacredit neither claims that Debtors are involved in organized crime, nor does it attempt to show that the predicate acts are likely to continue. To meet its burden on the element of contunuance, Cofacredit dates the beginning of the scheme as April 1988. (Am. Compl. at ¶¶ 16–17.) The end of the scheme was signaled by Cofacredit's refusal to factor further HED–France invoices after the end of September 1988. (Pl.['s] SOF at ¶ 82.) Such a closed period must comprise a "substantial period of time." *H.J. v. Northwestern Bell,* 492 U.S. at 242, 109 S.Ct. at 2902. Based upon other cases in this circuit, the six months the Plaintiff apparently claims the scheme operated, is too short a period to constitute a "substantial period of time." Thus, the facts that Cofacredit has presented do not support a conclusion that a sufficient pattern of racketeering activity ever existed.

### e. The RICO Conspiracy

 The facts submitted to support Plaintiff's cause of action for the Debtors conspiracy to violate the RICO statute are insufficient. The claimants must allege that each member of the conspiracy personally agreed to participate in activities prohibited under the RICO statute; the Plaintiff makes no such allegations. In addition no such agreement could even be remotely inferred from the Plaintiff's submission. Moreover, the Plaintiff must show that it suffered an injury from predicate acts prohibited under the RICO statute. We concluded earlier, with respect to the substantive RICO claims that the Plaintiff's chance of proving the predicate acts of wire and mail fraud against the Debtors was small. Accordingly, with the problems of proof highlighted above, the probability of success on this claim is appreciably smaller than on the substantive RICO claim.

### f. Estimation

 The opportunity for Cofacredit to prevail on its RICO claims is remote. The Plaintiff did not plead its claim with particularity and did not adequately plead the predicate acts of mail and wire fraud. Furthermore, Cofacredit did not demonstrate nor indicate a probability of demonstrating the existence of a RICO enterprise or a pattern of racketeering, nor did it sufficiently plead or offer to prove a civil RICO conspiracy.

The Court calculates the expected recovery based upon the Plaintiff prevailing on its

RICO claim as an amount approaching zero, yet the Court recognizes that randomly-selected juries might have reached the following results yielding an expected recovery value on these claims of $145,000:

| Amount of Possible Award | Probability | Expected Value |
| --- | --- | --- |
| $3,502,860 | 0 | $ 0 |
| 700,000 | .1 | 70,000 |
| 250,000 | .2 | 50,000 |
| 100,000 | .25 | 25,000 |
| 0 | .45 | 0 |

TOTAL EXPECTED VALUE $145,000

## G. THE COMMON LAW CONSPIRACY CLAIM

### 1. DISCUSSION

Cofacredit alleges a common law conspiracy to defraud. (Am.Compl. at ¶¶ 32–34.) This is a civil conspiracy claim defined in New York as:

an agreement or confederation between two or more persons intentionally participating in the furtherance of a preconceived common plan or purpose to defraud. To constitute an actionable conspiracy, plaintiffs must establish not only the corrupt agreement between two or more persons, but their intentional participation in the furtherance of the plan or purpose, and resulting damage. *Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986) (quoting *Von [Vom] Lehn v. Astor Art Galleries, Ltd.* [86 Misc.2d 1], 426 [380] N.Y.S.2d 208, 210 [532, 538] (Sup.Ct.1980 [1976] )); *See also Arlilnghaus v. Ritenour,* 622 F.2d 629, 639 (2d Cir.1980), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980).

To prove a civil conspiracy, a plaintiff must demonstrate: (1) a corrupt agreement, (2) an overt act in furtherance, and (3) resulting damage. *Kashi,* 790 F.2d at 1055. "Proof of a civil conspiracy under New York Law 'connect[s] a defendant with the transaction and ... charge[s] him with the acts and declarations of his co-conspirators'." *Kashi,* 790 F.2d at 1054 (quoting *Green v. Davies,* 182 N.Y. 499 75 N.E. 536 (1905)).

The Plaintiff's claim, however, probably will fail because civil conspiracy is not an independent tort in New York State. *Valdan Sportswear v. Montgomery Ward & Co.,* 591 F.Supp. 1188, 1191 (Bankr.S.D.N.Y.

1984). Thus, liability for a civil conspiracy rests on whether the "overt acts alleged" create an action under traditional tort law. *United States v. Rivieccio,* 846 F.Supp. 1079, 1083–84 (Bankr.E.D.N.Y.). We have already concluded that the Plaintiff's fraud claim is weak. Since fraud is the tort that forms the basis for the Plaintiff's conspiracy claim, the probability of its prevailing on the conspiracy claim is even less likely than the probability of its prevailing on the underlying tort claim. Moreover, the Plaintiff offered nothing from which the Court could conclude that a "corrupt agreement" existed among the Defendants.

### 2. ESTIMATE OF THE CONSPIRACY CLAIM

While this Court concludes that the Plaintiff has a very small chance of prevailing on the conspiracy claim, a randomly-selected jury might have reached the following results yielding an expected recovery value on the claim of $102,000:

| Amount of Possible Award | Probability | Expected Value |
| --- | --- | --- |
| $1,167,620 | 0 | $ 0 |
| 900,000 | .02 | 18,000 |
| 600,000 | .13 | 78,000 |
| 300,000 | .20 | 16,000 |
| 0 | .75 | 0 |

TOTAL EXPECTED VALUE $102,000

Adjusting this for only a one out of five chance that this cause of action would get to a jury gives us a value of $20,400.

## VII. THE ESTIMATE OF COFACREDIT'S CLAIM IN BANKRUPTCY

Cofacredit has advanced five causes of action to support its claim in bankruptcy. The Court has estimated the value of each of these claims as follows:

| | Claim | Amount |
| --- | --- | --- |
| 1. | Contract | $ 58,000 |
| 2. | Estoppel | 58,381 |
| 3. | Fraud | 16,587.50 |
| 4. | RICO | 145,000 |
| 5. | Conspiracy | 20,400 |

When damages are sought under several legal theories for the same injury, the verdicts should be identical, but only a single recovery permitted. *Wickham Contracting Co. v. Board of Education,* 715 F.2d 21, 28

538

(2d Cir.1983); *See also Ostano Commerzanstalt v. Telewide Systems, Inc.,* 880 F.2d 642, 649 (2d Cir.1989); *Clark v. Taylor,* 710 F.2d 4, 8 (1st Cir.1983). The Plaintiff, especially when the value of a claim is based upon an estimate, is entitled to recover damages under the theory resulting in the largest recovery. *Compare Rita v. Carella,* 394 Mass. 822, 477 N.E.2d 1016, 1018 (1985). Thus, the value of Cofacredit's claim is estimated at $145,000.

Settle order within fifteen days on ten days' notice.